329 S.E.2d 106

**Elizabeth Elana GANT**

v.

**Frank Larry GANT.**

**No. 16590.**

Supreme Court of Appeals of West Virginia.

April 12, 1985.

Michael T. Clifford, Leo Catsonis, Charleston, for appellant.

Lewis, Ciccarello, Masinter & Friedberg, Arthur T. Ciccarello, Charleston, for appellee.

NEELY, Chief Justice:

Elizabeth Elana Gant and her husband, Frank Larry Gant, have lived a truly bizarre life since they were married in Reno, Nevada on 21 December 1979. At the time of their marriage Larry was approximately forty-seven years old and Elana was about thirty-four years old; Larry had been married at least once before and Elana had been married three times before. The couple lived together in Reno for about a year before they were married, and at the time of their marriage Larry was a physician specializing in internal medicine. Elana was a licensed vocational nurse in the state of California and had a realtor's license in Nevada.

Larry suffered from a number of mental problems, including severe depression, and was advised by a doctor in Reno to give up the practice of internal medicine. Because of Larry's mental problems, Larry and Elana moved to Charleston so that Larry could complete a residency in psychiatry and at the same time receive psychiatric care. The testimony in the lower court is replete with examples of erratic behavior by both Larry and Elana, including physically violent fights and arguments, strange sexual episodes involving third parties, taking money from each other in cash and writing

checks on each other's accounts, destruction of each other's property at various times, and miscellaneous abuse, often in the course of extensive drinking bouts.

The day before they were married in Reno, Larry and Elana entered into a prenuptial agreement under which Elana waived all of her rights to alimony in the event of divorce.[1] Then, in September, 1981, after numerous separations and reconciliations, the parties entered into a separation agreement providing that Larry

1. The agreement, in its entirety, provides:

THIS ANTENUPTIAL AGREEMENT, made and entered into this 21 day of December, 1979, by and between F. Larry Gant, of the City of Reno, County of Washoe, State of Nevada, hereinafter referred to as "PROSPECTIVE HUSBAND", and ELIZABETH ELANA EVANS, of the City of Reno, County of Washoe, State of Nevada, hereinafter referred to as "PROSPECTIVE WIFE".

WITNESSETH:

WHEREAS, it is the intent of the parties hereinabove named, to become married prior to January 1, 1980; and,

WHEREAS, each of the parties has certain separate property which the other has acquired prior to marriage and each of the parties desires to retain their separate property without the same being affected by the marriage or converted to community property; and,

WHEREAS, it is the intent of the parties for the purpose of this agreement that each waive any community property rights the other may have to the earnings, rents, issues, profits, and other accruals as a result of community labor or efforts; and,

NOW, THEREFORE, in consideration of the mutual terms, conditions, and covenants hereinafter set forth, the parties agree as follows:

1. The Prospective Husband and Prospective Wife agree with each other that none of their respective property rights shall in any way become affected or changed in any way by reason of their marriage.

2. That Prospective Husband hereby waives, releases, foregoes, and disclaims all his rights in any and all property, real, personal, or mixed, wheresoever situate, of which the Prospective Wife is or may become seized or possessed, and hereby expressly waives all right to inherit from Prospective Wife under the laws of any and all states of the United States, and hereby agrees that Prospective Wife shall have the right to dispose of all her property by Will. In the event the Prospective Wife fails to dispose of any of her property, of any kind, by Will, then said property shall descent to her legal heirs, other than Prospective Husband, and the Prospective Husband shall not inherit anything from her.

3. That Prospective Wife hereby waives, releases, foregoes, and disclaims all her rights in any and all property, real, personal, or mixed, wheresoever situate, of which the Prospective Husband is or may become seized or possessed, and hereby expressly waives all right to inherit from Prospective Husband under the laws of any and all states of United States, and hereby agrees that Prospective Husband shall have the right to dispose of all his property by Will. In the event the Prospective Husband fails to dispose of any of his property, of any kind, by Will, then said property shall descent to his legal heirs, other than Prospective Wife, and the Prospective Wife shall not inherit anything from him.

4. The provisions of this agreement shall not prohibit wither [sic] Prospective Husband or Prospective Wife from making any gift, in any amount, to his or her respective spouse, and that gift shall become the separate property of the donee spouse.

5. Prospective Wife hereby waives any and all claims for support, alimony or other subsistence from Prospective Husband in the event of a divorce.

6. Prospective Husband and Prospective Wife shall execute and deliver any other instruments or documents, necessary or convenient, to give effect to the provisions of this agreement.

7. This agreement may be modified, amended or rescinded at any time after the solemnization of the marriage, by subsequent written agreement between Prospective Husband and Prospective Wife.

8. The provisions contained in this agreement represent the entire understanding between Prospective Husband and Prospective Wife pertaining to the respective property and marital property rights.

9. Each of the parties hereby acknowledges that the other has made full disclosure to the other of all property owned or otherwise held by each respective party.

10. The parties hereby acknowledge that they, and each of them, have been either represented by counsel of their choice in the preparation of this agreement, or have had full opportunity to consult with an attorney of their selection pertaining to the terms and conditions of this particular agreement and to advise them as to the legal effect of this agreement whereby they would understand the terms, provisions and other aspects that may effect their marital property rights. In the event that either party has not consulted an attorney pertaining to the terms and conditions of this agreement, he acknowledges that he fully understands the terms and conditions and waives any objection he may have at a later time based upon he was not advised by an attorney of his own selection of the legal effect of this agreement.

IN WITNESS WHEREOF, the parties have executed this agreement in Reno, Nevada on the day and year first above written.

would pay Elana $800 per month for twenty-four months, that he would pay her $3,000 at the time the agreement was executed, and that he would pay her tuition in a nurse's training program for three semesters. After that separation agreement was signed, however, the parties reconciled and lived together a bit longer until Elana brought this divorce action in September 1982. Then, while this action was pending, the circuit court ordered that Larry pay Elana $600 per month as *pendente lite* support beginning 1 December 1982, that he pay her monthly rent of $375.00, that he pay all reasonable family expenses incurred on behalf of either of them before 1 October 1982, and that he reimburse Elana for any expenses that she had paid before that date.

Larry and Elana own both real and personal property around the United States. For example, Larry has been the owner of a valuable condominium apartment in Reno with an equity of approximately $54,000 and a boat, docked apparently in South Carolina. Larry also owns personal property associated with his former medical practice. Elana owns two horses in California, a valuable silver-studded saddle, some costly silver flatware, and she apparently brought $20,000 hard cash into the marriage that the couple used for joint expenses as they moved around the country.

Finally, on 22 October 1984, after three hearings before a commissioner and mountains of incomprehensible testimony concerning the "who-struck-John" of a tumultuous relationship, the circuit court ratified a commissioner's report and ordered as follows:

1. That the antinuptial [sic] agreement between the parties dated the 21st day of December, 1979 is invalid and unenforceable.

2. That the property settlement agreement entered into between the parties bearing date the 29th day of September, 1981 is enforceable except for the alimony provisions contained therein.

3. That all of the personal property, furnishings, fixtures, utensils, appli-ances, stereos, etc., now in the possession of the plaintiff in her residence shall remain her sole and separate property.

4. That any and all property that is in storage in Charleston, West Virginia shall become the sole and separate property of the defendant.

5. That the plaintiff's request for a judgment reflecting her dower interest in the defendant's real estate be denied.

6. That the defendant be granted the sole and separate title to the 25 foot family-sized boat with trailer.

Earlier, however, on 11 June 1984, the circuit court had found Larry in arrears in paying Elana's rent and interim support, and entered an order as follows:

1. That the Petitioner, Elizabeth Elana Gant, do recover of and from the Respondent, Frank Larry Gant, a judgment in the sum of Seven Thousand Eight Hundred and Fifty Dollars ($7,850.00), together with a penalty of one (1%) percent per day, commencing on the 23rd day of April, 1984 on the total amount due, or the unpaid balance thereof, until the same shall have been paid in full. Said judgment aforesaid being that amount which the Respondent is in arrears for temporary alimony and support of the Petitioner through May of 1984.

2. That the Petitioner, Elizabeth Elana Gant, do recover of and from the Respondent, Frank Larry Gant, a judgment in the sum of Three Thousand Four Hundred Fifty-Seven Dollars and Fifty-One Cents ($3,457.51), together with a penalty of one (1%) percent per day commencing on the 23rd day of May, 1984 for each day that said amount remains unpaid, calculated against the balance due on said judgment.

In the final court order of 22 October 1984 the circuit court specifically provided that the money owed to Elana for rent and temporary support, and the accrued penalties at the rate of one-percent-per-day should continue to be owed by Larry. In this regard, the final court order said:

It is further Adjudged, Ordered and Decreed that the previous Order of this Court which established temporary obli-

gations relative to support and maintenance of the plaintiff shall not be deemed to have been forgiven by this Order and the judgment and arrearage thereunder, together with penalties for nonpayment thereof shall continue and remain in full force and effect and will be reduced to a sum certain with penalties by subsequent Order of this Court.

The Court then awarded Elana attorneys' fees of $4,552.50 plus costs advanced of $675.71. Larry now appeals.

## I

■ Larry asserts that the court erred in finding the prenuptial agreement into which the parties entered the day before their marriage, and in which Elana waived her right to alimony in the event of divorce, void and unenforceable. We agree with the appellant that the prenuptial agreement is valid and enforceable. The trial court found that Elana was not represented by counsel at the time she signed the agreement, that the agreement was not carefully prepared, that it is unfair, inequitable, and overreaching, and that it did not take into account the size of the parties' separate estates. We differ, however, with the circuit court's conclusions in these regards.

## A

■ At the time the prenuptial agreement was entered into both Larry and Elana were middle-aged individuals, and both had been married before. The prenuptial agreement in question was valid under Nevada law at the time it was entered into. *Calvert v. Calvert*, 61 Nev. 168, 122 P.2d 426 (1942); *See also Buettner v. Buettner*, 89 Nev. 39, 505 P.2d 600 (1973); *Applebaum v. Applebaum*, 93 Nev. 382, 566 P.2d 85 (1977); *Eikelberger v. Tolotti*, 96 Nev. 525, 611 P.2d 1086 (1980). Furthermore, prenuptial agreements are specifically recognized in this State by statute, *W.Va.*

*Code*, 48–2–1(b) [1984]. Under *W.Va.Code*, 48–2–1(b) [1984] the only statutory grounds for voiding a prenuptial agreement are that either of the parties is a minor at the time the agreement is entered into or that the female party to the agreement is pregnant at the time the agreement is entered into.

■ Obviously, general contract law governs prenuptial agreements, 2 S. Williston, *A Treatise on the Law of Contracts* § 270 B (3d ed.1959), but nowhere in the law of contracts is it required that a party be advised by independent counsel before an agreement to which he or she sets his or her hand is enforceable. The basic requirement of a prenuptial contract is fundamental fairness (as we shall define this term *infra*) under the totality of the circumstances. *See, e.g., In re Strickland's Estate*, 181 Neb. 478, 149 N.W.2d 344 (1967); *Rocker v. Rocker*, 13 Ohio Misc. 199, 232 N.E.2d 445 (1967); *In re Hillgass' Estate*, 431 Pa. 144, 244 A.2d 672 (1968); *Bauer v. Bauer*, 1 Or.App. 504, 464 P.2d 710 (1970); *In re Broadie's Estate*, 208 Kan. 621, 493 P.2d 289 (1972); *In re Kester's Estate*, 486 Pa. 349, 405 A.2d 1244 (1979).

In the case before us, the record shows no overbearing behavior on the part of Larry; Elana does not even assert that if she had wanted to consult with independent counsel Larry would have discouraged her, nor does Elana assert that Larry induced her to sign the prenuptial agreement through fraud.

## B

■ The older law throughout America was that prenuptial agreements that governed property distribution at the time of *death* were presumptively valid; [2] however, prenuptial agreements that govern property distributions at the time of *divorce* were either presumptively invalid or totally void as against public policy. The older rule

---

**2.** We have always strongly favored prenuptial agreements that establish property rights at *death* in West Virginia. *Pickett et ux v. Chilton*, 5 Munf. 467 (1817); *Charles v. Charles*, 8 Grat. 486, 56 Am.Dec. 155 (1852); *Mitchell v. Moore & als.* 16 Grat. 275 (1861); Syl. pt. 1, *Coatney v. Hopkins*, 14 W.Va. 338 (1878); Syl. pt. 2, *Beard*

*v. Beard*, 22 W.Va. 130 (1883); Syl. pt. 1, *Hinkle v. Hinkle*, 34 W.Va. 142, 11 S.E. 993 (1890); Syl. pt. 2 *Bramer v. Bramer*, 84 W.Va. 168, 99 S.E. 329 (1919); *Williamson v. First National Bank of Williamson*, 111 W.Va. 720, 164 S.E. 777 (1931); *Gieseler v. Remke*, 117 W.Va. 430, 185 S.E. 847 (1936).

was grounded in yesteryear's sound public policy: in general, thirty years ago women did not work in the market economy; society enjoyed a consensus that favored lifetime marriage and disfavored divorce; and prenuptial agreements that limited the support obligation in favor of former wives encouraged divorce and made divorced women potential charges of the state. *Oliphant v. Oliphant*, 177 Ark. 613, 7 S.W.2d 783 (1928); *French v. McAnarney*, 290 Mass. 544, 195 N.E. 714, 98 A.L.R. 530 (1935); *Fincham v. Fincham*, 160 Kan. 683, 165 P.2d 209 (1946); *Hartz·v. Hartz*, 248 Md. 47, 234 A.2d 865 (1967).

Circumstances have changed dramatically in the last three decades, however. As Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–2 et seq. (1972), amply demonstrates, women are protected in their efforts to enter the market sector of the economy, and in fact, today 58.7 percent[3] of all married women are gainfully employed. Furthermore, we no longer have a society-wide consensus on the sanctity of marriage: although in 1960 there were only 35 divorced persons per 1,000 married persons in the United States,[4] as of 1983 there were 114 divorced persons per 1,000 married persons in the United States.[5] Currently divorces are being granted in the United States at the rate of approximately 1,200,000 per year.[6]

Newer law granting contract validity to prenuptial agreements that establish property rights *at the time of divorce* is related to the fact that such agreements may, indeed, encourage rather than discourage marriage in the 1980's. The case before us now is a good example of how a prenuptial agreement may encourage marriage: Larry and Elana were living together in a joint household for a year before they married, and given Larry's previous bad luck with domestic life he may not have been willing to risk marriage again without a contractual limitation on his economic liability in the event of divorce. In fact, Larry and Elana's situation is hardly unique; nationwide figures show that at the last census there were 1,988,000 cohabiting, unmarried couples of the opposite sex in America.[7] This figure alone demonstrates that there are now few impediments to establishing joint households without benefit of formal marriage among people of opposite sex. Thirty years ago, on the other hand, employers, apartment owners, and even neighbors were likely to discriminate against cohabiting, unmarried adults of opposite sex by firing them, refusing to rent to them, or socially ostracizing them.

### C

The institution of marriage still confers substantial benefits on both the couple involved and society as a whole, however. Therefore the legal system must continue to encourage marriage even if that means honoring prenuptial agreements that are not to judges' personal liking. Social security, employer pension and health benefits, inheritance rights, and rights in real property are all tied to marital relationships.[8] The reason for this has less to do with what was once inscribed on stone tablets than with what is currently entered on actuarial tables. Cohabiting couples cannot be given the benefits of social programs or rights of intestate succession designed for married couples because of lack of statistical precision and great uncertainty in anticipating or proving such relationships.

Under the traditional marriage laws a person can be married to only one person at a time. The Social Security Administration knows that if a person is a dues-paying member of its program it will need to pay benefits only to that person's spouse, and more to the point, to only one spouse. If

---

**3.** U.S. Bureau of the Census, *Statistical Abstract of the United States:* 1985 (105th edition) Washington, D.C., 1984 at 398.

**4.** *Id.,* at 38.

**5.** *Id.*

**6.** *Wall St. Journal,* 23 Dec. 1982, at 1 col. 1.

**7.** *Statistical Abstract of the United States, supra* note 4, at 40.

**8.** *See* R. Neely, *The Divorce Decision,* McGraw-Hill (New York, 1984), Chp. 6.

two or more persons claim spousal benefits, the Social Security Administration also knows that a state court will determine which claim should be honored. In terms of how many people claim retirement benefits under another's account, the limited options allow for actuarial soundness: a person can have either one spouse or no spouse. If, on the other hand, a person's cohabiting partner can claim benefits, why not two or three cohabiting partners? There are no available or readily imaginable criteria for deciding which partner gets the benefits, or even whether two or more should qualify. Formal marriage, however, avoids all of these problems.

An employer can provide a pension for a worker and his or her spouse, but he must know in advance how many claimants will qualify for benefits. If cohabiting partners come forward to claim benefits, the actuaries will go beserk because the cost of these claims has not been budgeted into the system, nor has the cost of litigation to determine who is entitled to the benefits if entitlement is limited to the one cohabiting mate who looks most like a traditional wife or husband. Similar problems arise with respect to children. Legitimate children can be provided for under health and survivors' insurance programs. If, however, anyone with a job can give any child of his or her choosing the right to use his or her health card, health insurance rates will skyrocket.

This society's staggering divorce rate can only place any reasonable person on notice that divorce is as likely an outcome of any given marriage as a permanent relationship. Modern laws that allow alimony to be awarded in no-fault divorces,[9] and that provide for the equitable distribution of all property acquired by joint efforts during the course of a marriage fulfill a useful function in today's society. *LaRue v. LaRue,* 172 W.Va. 158, 304 S.E.2d 312 (1983); *W.Va.Code,* 48–2–4(a)(10) [1981]; *Del.Code Ann. tit.* 13, § 1513(a) [1981]; *Ill.Ann.Stat.* ch. 40, § 503(d) [Smith-Hurd 1984]; *Minn.Stat.Ann.* § 518.58 [West

1984]. Nonetheless, it should be obvious that a person like our appellant, Larry Gant, who enjoys a financial position that places him in the top one percent of all income-earning Americans, will be reluctant to marry when modern divorce law (including some paramater for judicial caprice) places both his property and future income at jeopardy. Furthermore, as the facts of this case amply demonstrate, he need not marry. He can conceivably live with a woman for years without any social or financial pressure to formalize his relationship.

 All of these realities have been implicit in the changing attitude of the courts towards the validity of prenuptial agreements that look toward divorce. *Posner v. Posner,* 257 So.2d 530, (Fla.1972) [mandate conformed to, 260 So.2d 536 (1972)]. *Unander v. Unander,* 265 Or. 102, 506 P.2d 719 (1973); *Dingledine v. Dingledine,* 258 Ark. 204, 523 S.W.2d 189 (1975); *In re Marriage of Dawley,* 17 Cal.3d 342, 131 Cal.Rptr. 3, 551 P.2d 323 (1976); *Parniawski v. Parniawski,* 33 Conn.Sup. 44, 359 A.2d 719 (1976); *In re Marriage of Stokes,* 43 Colo.App. 461, 608 P.2d 824 (1979); *Burtoff v. Burtoff,* 418 A.2d 1085 (D.C.App.1980). Courts still reserve more authority to review the substantive terms of prenuptial contracts than they do commercial contracts because, as the Maryland court has said, the state is a third party to any marriage contract. *Frey v. Frey,* 298 Md. 552, 471 A.2d 705 (1984). Yet nationwide, the emerging view is that prenuptial agreements that settle property rights at the time of *divorce* are presumptively valid if the agreement was validly procured and is ostensibly fair in result. In order for the procurement to be valid there must be an absence of fraud, duress, or misrepresentation, and the agreement must have been executed voluntarily, with knowledge of its content and legal effect.

Many courts supervise prenuptial agreements by inquiring into their "fairness," either at the time they were entered into,

---

9. *Dyer v. Tsapis,* 162 W.Va. 289, 249 S.E.2d 509 (1978); *F.C. v. I.V.C.,* W.Va., 300 S.E.2d 99 (1982); *Crutchfield v. Crutchfield,* 172 W.Va. 7, 302 S.E.2d 76 (1983).

or at the time of divorce, or at both times. We have no problem accepting the requirements set forth in the jurisdictions cited above that prenuptial agreements must be voluntarily and knowledgeably entered and validly procured, but we are loath to apply a vague and entirely subjective standard of "fairness." Throughout all of contract law there is the recurring problem of disparity of bargaining power; thus if mere disparate bargaining power alone is grounds for invalidating contracts, contracts between rich and poor or between strong and weak will always be of questionable validity. Such, however, is not the rule elsewhere in contract law, and we see no policy reasons to make it so in the law of prenuptial agreements.

The term "fair," without some further elaboration, gives no guidance whatsoever concerning which agreements will be binding and which agreements will be struck down. Furthermore, candor compels us to raise to a conscious level the fact that, as in this case, prenuptial agreements will almost always be entered into between people with property or an income potential to protect on one side and people who are impecunious on the other. Measuring an agreement by an undefined judicial standard of fairness is an invitation to the very wealth redistribution that these agreements are designed to prevent.

## D

The cases that discuss prenuptial agreements in other jurisdictions lead to the conclusion that when courts talk about "fairness" in the setting of a prenuptial agreement, they are usually not talking about an entirely subjective, open-ended concept that allows judges to renegotiate contracts and substitute their own judgment for the agreement of the parties. Rather, what other courts are really concerned about is "foreseeability." [10]

In the case of Larry and Elana Gant there is no reason not to honor the parties' prenuptial agreement because circumstances have transpired exactly as the parties foresaw that they might transpire at the time the prenuptial agreement was made. Basically, things did not work out romantically between two middle-aged adults, and that was the exact eventuality about which they had bargained and contracted.

But what would our decision be in this case if Elana and Larry had had an idyllic relationship for five years and had decided to have three children? Certainly that was not a foreseen event, and if ten years after entering into this prenuptial agreement, with three hypothetical children aged four, three, and one, Larry had decided to divorce, these hypothetical, unforeseen, intervening events would compel us to think very hard about whether to honor the pre-

---

**10.** The Uniform Premarital Agreement Act was approved by the National Conference of Commissioners on Uniform State Laws in 1983. The Commonwealth of Virginia is the first state to adopt this Act. It was approved by the Governor, to take effect on 1 July 1986, if reenacted before that date, 1985 Va. Acts Chapter 434, *Va.Code,* 20–147 et seq. [1985]. The Uniform Act's key operative section, § 6, sets forth the conditions that must be proven to avoid the enforcement of a premarital agreement:

(a) A premarital agreement is not enforceable if the party against whom enforcement is sought proves that:

(1) that party did not execute the agreement voluntarily; or

(2) the agreement was unconscionable when it was executed and, before execution of the agreement, that party:

(i) was not provided a fair and reasonable disclosure of the property or financial obligations of the other party;

(ii) did not voluntarily and expressly waive, in writing, any right to disclosure of the property or financial obligations of the other party beyond the disclosure provided; and

(iii) did not have, or reasonably could not have had, an adequate knowledge of the property or financial obligations of the other party.

(b) If a provision of a premarital agreement modifies or eliminates spousal support and that modification or elimination causes one party to the agreement to be eligible for support under a program of public assistance at the time of separation or marital dissolution, a court, notwithstanding the terms of the agreement, may require the other party to provide support to the extent necessary to avoid that eligibility.

(c) An issue of unconscionability of a premarital agreement shall be decided by the court as a matter of law.

nuptial agreement's waiver of alimony. Elana would need support for herself so that she could care for the children, but neither party had contemplated having children at the time they entered into the agreement.

In crafting rules in an area such as the enforcement of prenuptial agreements only one thing is certain: no matter what rules we adopt, there will be cases when the application of those rules will be inequitable. Therefore, the question to be asked is whether the adoption of firm rules making prenuptial agreements presumptively enforceable in their stated, explicit terms will advance or undermine legitimate public policy that favors marriage. In the field of prenuptial agreements, firm rules favoring enforceability inevitably further the public policy of encouraging middle aged, cohabiting couples to regularize their relationships by getting married.

Furthermore, these rules are unlikely to have any untoward consequences among those marrying for the first time and contemplating children because experience instructs us that it is a rare, starey-eyed couple in their early twenties who enter into an elaborate prenuptial agreement; after all, among the young, marriage is an exercise in optimism. Such optimism, however, is less likely among those who have been divorced one or more times, and it is an understandable pessimism, based upon the national statistics cited above, that cause many middle aged individuals—particularly those with property or income to protect—to prefer unmarried cohabitation to formal marriage. Although courts have a high regard for their own wisdom, not everyone has unreserved enthusiasm for the proposition that at divorce time his or her future economic well-being is entirely "within the sound discretion of the trial court judge." *Zirkle v. Zirkle*, 172 W.Va. 211, 304 S.E.2d 664 (1983). *See also W.Va. Code*, 48–2–15 [1980].

■■■ Accordingly, we hold today that in West Virginia prenuptial agreements that establish property settlements and support obligations at the time of *divorce* are presumptively valid. The burden of demonstrating the invalidity of a prenuptial agreement is upon the person who would have it held invalid. Although advice of independent counsel at the time parties enter into a prenuptial agreement helps demonstrate that there has not been fraud, duress, or misrepresentation, and that the agreement was entered into knowledgeably and voluntarily, such independent advice is not a prerequisite to enforceability when the terms of the agreement are understandable to a reasonably intelligent adult, as long as both parties had the *opportunity* to consult with independent counsel.

■■■ Unless a prenuptial agreement is so outrageous as to come within unconscionability principles as developed in commercial contract law, *W.Va.Code*, 46–2–302 [1963], West Virginia courts will not evaluate the substantive fairness of prenuptial agreements; most prenuptial agreements are designed to preserve the property interests of the stronger party. Nonetheless, prenuptial agreements will be enforced in their explicit terms only to the extent that circumstances at the time the marriage ends are roughly what the parties foresaw at the time they entered into the prenuptial agreement. In this regard the passage of time, a change of position based upon reasonable reliance on the permanence of the marriage, and the birth of children are relevant factors, among others, for a court to consider.

### E

■■■ In the case of Larry and Elana Gant we find nothing unreasonable about Elana's waiver of alimony given the circumstances of the parties at the time that they entered into the agreement. Both parties were middle-aged, both had been married before, and the divorce occurred sufficiently close in time (5 years) to the signing of the prenuptial agreement that this divorce was an event that was contem-

plated and foreseen at the time the agreement was entered into.

■ Elana, on her side, achieved some substantial benefits from her marriage; if the marriage had been successful, Elana would have had the right to benefits under Larry's social security account (which, given his much higher relative salary, was not an insubstantial consideration) and during the term of the marriage she was entitled to share his income and enjoy his support. Furthermore, although Elana specifically waived all of her inheritance rights, it is perfectly reasonable to assume that had the marriage been successful she would have inherited some or all of Larry's property at the time of his death. Consequently, we cannot say that there was no consideration for Elana's covenant in the agreement, or that the agreement was inequitable and one-sided. Although it may be unfashionable to point this fact out in the 1980's, marriage can be of substantial economic, as well as emotional value to a financially weak party. It is not necessarily unfair or unconscionable for wealthy people to agree to marry—thus conferring on their partners all the benefits of income sharing, pension rights, and inheritance if the marriage works out—in return for a promise not to demand all those advantages if the marriage does not work out.

## II

■ The next question, then, is whether the court erred in awarding Elana the sum of $650.00 per month for a period of eighteen months. Larry argues that if the prenuptial agreement is valid, this alimony award is improper. We disagree, however, even though Elana's waiver of alimony in the prenuptial agreement is binding, because the court's $650.00 per month award for eighteen months—$11,700 in total—was not the type of payment that the alimony waiver provision in the agreement contemplates. Evidence of the correctness of this conclusion may be found in the 29 September 1981 property settlement agreement under which Larry specifically agreed to pay Elana "alimony" of $800.00 per month for twenty-four months. Although the parties reconciled after this property settlement agreement was signed, the agreement is good evidence of what the parties considered an equitable property division upon divorce.

Although the circuit court denominated Elana's $650.00 per month for eighteen months "alimony," those payments are actually an equitable distribution of property; they are not the type of lifetime support that was contemplated by the use of the word "alimony" in the prenuptial agreement. It must be remembered that Elana brought $20,000 in cash, as well as furniture and other assets into the marriage. The circuit court's final order amounted to installment payments totalling $11,700 that allow Elana to recoup her share of the marital property.

The court could have availed himself of the alternative of awarding Elana $11,700 all at once as an equitable distribution of family assets, but the record shows that Larry is in no position to pay such an amount all at once. Furthermore, it clearly appears from the court's order that these "alimony" payments were not traditional, judicially decreed alimony because there was no right to apply for modification. By denominating Elana's $650.00 per month installment payment "alimony," the court allowed Elana to use the contempt power to compel payment and we find no error there because Larry has been inordinately recalcitrant throughout these proceedings as we shall see in the next section.

## III

We come now to the appellant's primary assignment of error, which is that the court exceeded his legitimate powers in assessing a one-percent-per-day penalty for every day that Larry failed to pay interim support according to the court's 23 April 1984 order set forth *supra* in the introduction. On 11 June 1984, in another proceeding for con-

tempt, the court reaffirmed the 11 April 1984 order, entered a judgment for $7,850.00, another judgment for $3,457.51 and again assessed a one-percent-per-day penalty for late payment. When the final order in this case was entered, the judge specifically preserved Elana's right to receive accrued temporary support and reiterated that she was entitled to the 11 June 1984 judgments along with their penalties in addition to her $650.00 per month payments for eighteen months allowed in the final divorce decree.

We find that the court did not have jurisdiction to enter a continuing one-percent-per-day penalty for every day that Elana's payments were late because such a penalty amounts to a criminal contempt fine payable to a private party and not to the State. Furthermore, no fine can be assessed without the procedural safeguards surrounding criminal contempt. In *Eastern Associated Coal Company v. Doe*, 159 W.Va. 200, 220 S.E.2d 672 (1975), we explained the difference between civil and criminal contempt. Certainly, if the circuit judge believed that Larry was capable of paying Elana, the better course would have been to place him in jail until he made arrangements to purge himself of the contempt. In such a circumstance, Larry would have had the keys to the jail in his own pocket and the contempt would have been entirely civil. *See also: Floyd v. Watson*, 163 W.Va. 65, 254 S.E.2d 687 (1979); *State ex rel. Robinson v. Michael*, 166 W.Va. 660, 276 S.E.2d 812 (1981); *State ex rel. Walker v. Giardina*, 170 W.Va. 483, 294 S.E.2d 900, 36 A.L.R. 4th 964 (1982); *State ex rel. Koppers v. International Union, etc.*, 171 W.Va. 290, 298 S.E.2d 827 (1982); *In re Yoho*, 171 W.Va. 625, 301 S.E.2d 581 (1983).

There is little difference, however, between paying one-percent-per-day to Elana and paying one-percent-per-day to the State in the form of a fine. The purpose of civil contempt is to coerce obedience to a court's order; the purpose of criminal contempt is to exact a penalty for willful, deliberate, and contumacious disobedience of a court's order. Although the difference between going to jail until a court's order is obeyed and paying a monetary fine to the injured party because a court's order has not been obeyed may appear a distinction without a difference, we find that traditionally the civil penalty for failure to pay support is incarceration until such support is paid rather than the exaction of a private fine. Accordingly, we hold that the court erred in assessing the one-percent-per-day penalty, but that on remand if Larry is able to make arrangements to pay his accrued arrearages but refuses, the court should incarcerate him until such time as he pays.

IV

Finally, the appellant complains of the award of $4,552.50 in attorneys' fees in addition to an earlier award of $300.00 given in May, 1983. Because most of the litigation in this case was a direct result of the appellant's own litigious behavior and his willful resistance to court orders, we find no abuse of discretion in the attorneys' fee award.

Accordingly, for the reasons set forth above, the judgment of the Circuit Court of Kanawha County is affirmed in part and reversed in part and the case is remanded for further proceedings consistent with this opinion.

Affirmed in part; Reversed in part and Remanded for further proceedings.