721 S.E.2d 53

**Patricia E. LEE, Respondent Below, Petitioner**

v.

**Charles W. LEE, Petitioner Below, Respondent.**

No. 101605.

Supreme Court of Appeals of West Virginia.

Submitted Sept. 27, 2011.

Decided Nov. 21, 2011.

484

J. Burton Hunter, III, Esq., J. Burton
Hunter, III & Associates, PLLC, Buckhan-
non, WV, for Petitioner, Patricia E. Lee.

Peter J. Conley, Esq., Siegrist & White,
PLLC, Clarksburg, WV, Teresa J. Lyons,
Esq., Hedges Lyons & Shepherd, PLLC,
Morgantown, WV, for Respondent, Charles
W. Lee.

PER CURIAM:

This case is before this Court upon appeal
of a final order of the Circuit Court of Ups-
hur County entered on October 15, 2010, in
this divorce action between Patricia E. Lee,
the petitioner herein and respondent below
(hereinafter "Mrs. Lee"), and Charles W.
Lee, the respondent herein and petitioner
below (hereinafter "Mr. Lee"). In that order,
the circuit court denied Mrs. Lee's appeal of
a July 7, 2010, order of the Family Court of
Upshur County. The family court found that
Mrs. Lee was no longer entitled to reside in
the marital residence pursuant to the parties'
prenuptial agreement.

In this appeal, Mrs. Lee contends that she
did not enter into "another relationship" as
contemplated by the prenuptial agreement
and, therefore, continues to have the right to
occupy the marital home. This Court has
before it the petition for appeal, the response
thereto, the entire record, and the arguments
of counsel. For the reasons set forth below,
the final order is reversed, and this case is
remanded for entry of an order consistent
with this opinion.

## I.

### FACTS

The parties met in 2005 and were married
on July 28, 2007.[1] They separated on June
12, 2009, after Mr. Lee disclosed that he was
having an extramarital affair. The parties'
divorce was granted on the grounds of irrec-
oncilable differences. This appeal concerns
the prenuptial agreement which the parties
signed shortly before they were married.

According to Mrs. Lee, Mr. Lee advised
her two weeks before their wedding day that
he would not marry her unless she signed a
prenuptial agreement. Mr. Lee maintains
that he had told Mrs. Lee that he wanted a
prenuptial agreement before he gave her an
engagement ring. In any event, Mr. Lee
initially presented a prenuptial agreement to
Mrs. Lee that he found on the internet.
Thereafter, the parties spent approximately
seventeen hours negotiating the terms of the
agreement, but Mr. Lee primarily drafted
and typed the document. Neither party had
the benefit of counsel in drafting, negotiat-
ing, or reviewing the agreement.

---

1. The parties lived together for more than two    years before they were married.

At issue in this case is the provision in the prenuptial agreement concerning spousal support which states as follows:

In the event that there is a separation of the parties, the following will occur regarding spousal support:

-In the event of separation, Charles will provide Patti housing at no cost at Route # 9, Box 368, Buckhannon [2] until she decides to move or until she enters into another relationship. The provision of housing will include basic and "nationwide" phone service for the same period of time. As well as all other household expenses, with a limit of $500.00 per month, until such time as her minor children graduate from high school.

-Patti will be provided one of the family vehicles in the event of separation or divorce. She will be responsible for maintaining it and its continued operation.[3]

(Footnotes added). Mrs. Lee has a daughter from a previous marriage who was eight years old when the prenuptial agreement was signed.[4] After the parties separated, Mrs. Lee continued to live in the marital home in accordance with the prenuptial agreement.

During the divorce proceedings, the parties disputed the meaning of the phrase "another relationship" as set forth in the spousal support provision of the prenuptial agreement. Mr. Lee asserted that Mrs. Lee had already entered into another relationship and, therefore, was required to move out of the marital residence. He testified that he believed that another relationship meant "a romantic involvement or just a traditional sense of being with another partner." By contrast, Mrs. Lee stated that she understood "another relationship" to mean a relationship similar in character and duration to the one she had shared with Mr. Lee that would provide her financial security and a place to live.

The family court afforded the phrase "another relationship" broad construction in accordance with Mr. Lee's testimony and found that Mrs. Lee had entered into another relationship as contemplated by the agreement. In fact, the family court found that Mrs. Lee had entered into such relationships with three different men, all of whom had spent overnights in the marital home after the parties separated.[5] Consequently, the family court ordered Mrs. Lee to vacate the marital home in its July 7, 2010, order.

Following entry of the family court order, Mrs. Lee filed an appeal with the circuit court. Upon review, the circuit court found that the phrase "another relationship" as used in the prenuptial agreement is ambiguous. The circuit court further concluded, however, that the family court did not err by finding that Mr. Lee's representations as to the parties' intent with regard to the spousal support provision were more credible than those of Mrs. Lee. The circuit court also found that the evidence in the record supported the family court's finding that Mrs. Lee had entered into relationships as contemplated in the prenuptial agreement with three men after the parties separated. Accordingly, the circuit court denied Mrs. Lee's appeal by order entered on October 15, 2010. This appeal followed.

---

**2.** The marital residence was not jointly owned by the parties; rather, it had been purchased by Mr. Lee before the marriage.

**3.** The portion of this provision concerning the family vehicles is not at issue in this case.

**4.** It appears from the record that Mrs. Lee has two older children.

**5.** A complete transcript of the hearing below was not included in the record submitted to this Court. The orders and the briefs of the parties indicate that the family court found that Mrs. Lee had a one night sexual relationship with a man identified as J. Shelly based on the testimony of Chris Cutright, the fiancé of Mrs. Lee's older daughter. Mr. Cutright testified that Mrs. Lee brought J. Shelly home one night and that he heard various noises in the next room that led him to believe that they had sexual relations. It also appears that evidence was presented that Mrs. Lee had spent extended periods of time with a man named Rodney Stalnaker at his residence. Finally, the court found that Mrs. Lee had a relationship with a man named Jim Walker, a resident of Kentucky whom Mrs. Lee met through an internet dating service. Mrs. Lee denied having sexual relationships with J. Shelly and Rodney Stalnaker. She acknowledged that she had dated Jim Walker for a short period of time, but maintained that the sexual component of their relationship occurred in Kentucky.

## II.

### STANDARD OF REVIEW

■ As set forth above, Mrs. Lee is appealing a circuit court order denying her petition for appeal of a family court order. This Court has explained that

> [i]n reviewing a final order entered by a circuit court judge upon a review of, or upon a refusal to review, a final order of a family court judge, we review the findings of fact made by the family court judge under the clearly erroneous standard, and the application of law to the facts under an abuse of discretion standard. We review questions of law de novo.

Syllabus, *Carr v. Hancock*, 216 W.Va. 474, 607 S.E.2d 803 (2004). As discussed, the issue in this case concerns a provision in the parties' prenuptial agreement. This Court has advised that "[w]hen a trial court determines that an agreement is ambiguous and construes the meaning of a provision in the contract based on extrinsic evidence, such as the parties' intent, our standard of review is 'clearly erroneous.'" *Jessee v. Aycoth*, 202 W.Va. 215, 218, 503 S.E.2d 528, 531 (1998). With these standards in mind, the parties' arguments will be considered.

## III.

### DISCUSSION

The issue in this case is very straightforward: what is the meaning of the phrase "another relationship" as used in the parties' prenuptial agreement? The parties' arguments in this appeal mirror the ones made during the proceedings below. In other words, Mrs. Lee asserts that "another relationship" means a committed relationship akin to the one she had with Mr. Lee. To the contrary, Mr. Lee argues that the phrase "another relationship" simply contemplates a dating or sexual relationship. Mrs. Lee has admitted that she had a brief dating and sexual relationship with another man since the parties separated. In that regard, she testified during the proceedings below that she met a man through a social internet service. She stated that she spent approximately ten days with him during the course of three or four visits to his home in Kentucky. She further testified that the sexual component of this relationship occurred in Kentucky. Mrs. Lee has denied that she has had a sexual relationship with any other man since the parties separated.

■ Upon review, this Court agrees with the circuit court to the extent that it found that the phrase "another relationship" as used in the parties' prenuptial agreement is ambiguous. It is well-established that "[g]eneral contract law governs prenuptial agreements." *Gant v. Gant*, 174 W.Va. 740, 745, 329 S.E.2d 106, 112 (1985), *overruled on other grounds by Ware v. Ware*, 224 W.Va. 599, 687 S.E.2d 382 (2009). Under our basic rules of construction, "[t]he mere fact that parties do not agree to the construction of a contract does not render it ambiguous. The question as to whether a contract is ambiguous is a question of law to be determined by the court." Syllabus Point 1, *Berkeley County Public Service Dist. v. Vitro Corp. of America*, 152 W.Va. 252, 162 S.E.2d 189 (1968). Generally, whenever the language of a contractual provision is reasonably susceptible of two different meanings or where reasonable minds might be uncertain or disagree as to its meaning, it is ambiguous. Syllabus Point 1, *Shamblin v. Nationwide Mut. Ins. Co.*, 175 W.Va. 337, 332 S.E.2d 639 (1985). Stated another way, "[c]ontract language is considered ambiguous where an agreement's terms are inconsistent on their face or where the phraseology can support reasonable differences of opinion as to the meaning of words employed and obligations undertaken." Syllabus Point 6, *State ex rel. Frazier & Oxley, L.C. v. Cummings*, 212 W.Va. 275, 569 S.E.2d 796 (2002). Under the circumstances presented here, it is clear that reasonable minds could differ with respect to the meaning of the phrase "another relationship." In fact, in today's world, the term "relationship" has multiple meanings depending upon the context in which it is used.

■ "In order to resolve ambiguity in a contract, the intent of the parties must be ascertained." *Harris v. Harris*, 212 W.Va. 705, 709, 575 S.E.2d 315, 319 (2002). As this Court has explained:

If an inquiring court concludes that an ambiguity exists in a contract, the ultimate resolution of it typically will turn on the parties' intent. Exploring the intent of the contracting parties often, but not always, involves marshaling facts extrinsic to the language of the contract document. When this need arises, these facts together with reasonable inferences extractable therefrom are superimposed on the ambiguous words to reveal the parties' discerned intent.

*Fraternal Order of Police, Lodge Number 69 v. City of Fairmont,* 196 W.Va. 97, 101 n. 7, 468 S.E.2d 712, 716 n. 7 (1996). However, "in case of doubt, the construction of a written instrument is to be taken strongly against the party preparing it." *Henson v. Lamb,* 120 W.Va. 552, 558, 199 S.E. 459, 461–62 (1938). In other words, the ambiguous terms should be construed in such a manner as to effectuate the intention of the parties, but where the evidence pertaining to the parties' intent conflicts, the ambiguous terms should be construed against the party who drafted the document. *See* Syllabus Point 4, *National Mut. Ins. Co. v. McMahon & Sons, Inc.,* 177 W.Va. 734, 356 S.E.2d 488 (1987), *overruled on other grounds by Potesta v. U.S. Fidelity & Guaranty Co.,* 202 W.Va. 308, 504 S.E.2d 135 (1998) (holding that ambiguous terms in insurance contracts are strictly construed against the insurance company and in favor of the insured); Syllabus Point 3, *West Virginia Dept. of Highways v. Farmer,* 159 W.Va. 823, 226 S.E.2d 717 (1976) (holding that where an ambiguity exists in a deed, the language of such deed will be construed most strongly against the grantor).

■■■ As previously discussed, the parties in this case gave conflicting testimony regarding their understanding of the meaning of "another relationship" as set forth in the prenuptial agreement. The evidence clearly established, however, that the prenuptial agreement was entered into at Mr. Lee's

insistence and that he ultimately drafted the ambiguous spousal support provision. During the evidentiary hearing below, Mr. Lee testified that while Mrs. Lee had requested that a paragraph be added to the prenuptial agreement that would allow her to live in the marital residence in the event they separated until her daughter reached the age of eighteen, he actually drafted the provision. In fact, he specifically acknowledged that he came up with the phrase "another relationship." Despite the fact that Mr. Lee testified that he drafted the prenuptial agreement, the family court construed the phrase "another relationship" in Mr. Lee's favor and completely disregarded Mrs. Lee's testimony.[6]

Upon review, this Court finds that the family court clearly erred by construing the spousal support provision in the prenuptial agreement in Mr. Lee's favor and adopting his interpretation of the phrase "another relationship." The family court made no finding with regard to whether the agreement was or was not ambiguous, although it clearly seems to fit within the definition of that term as set forth above. Syllabus Point 6, *Frazier, supra.* Although the circuit court found the agreement to be "patently ambiguous," it concluded that the family court did not abuse its discretion by declining to construe the ambiguity against Mr. Lee. Relying upon cases from other jurisdictions,[7] the circuit court based this conclusion on a rule of construction whereby an ambiguity is construed against the party preparing the agreement only after the finder of fact has tried and failed to ascertain the parties' intent in an ambiguous agreement. As set forth above, our case law provides that "in case of doubt, the construction of a written instrument is to be taken strongly against the party preparing it." *Henson,* 120 W.Va. at 558, 199 S.E. at 461–62. Moreover, the family court was only able to ascertain the parties' intent in this case by making a credibility determina-

---

**6.** Mrs. Lee testified that she asked Mr. Lee if the provision in question meant that she had to remain celibate until her daughter was eighteen years old and that he replied, "Of course not, I just don't want some guy living in my house." Mr. Lee testified that he did not remember this specific conversation, but he did not deny it.

**7.** *See Klapp v. United Ins. Group Agency,* 468 Mich. 459, 663 N.W.2d 447 (2003); *Unit Vending Corp. v. Lacas,* 410 Pa. 614, 190 A.2d 298 (1963).

tion. The family court clearly abused its discretion by finding Mr. Lee's representations as to the parties' intent more credible than those of Mrs. Lee in view of the fact that their testimonies were diametrically opposed and there was no evidence reflecting an ongoing relationship involving cohabitation. Had Mrs. Lee entered into a sexual relationship involving cohabitation at the marital residence, then the credibility determination may have been appropriate. However, based on the evidence presented and pursuant to our rules of construction, the family court should have construed the ambiguous provision in Mrs. Lee's favor and found that the evidence did not establish that she had entered into "another relationship." Accordingly, the final order of the circuit court is reversed.

## IV.

### CONCLUSION

For the reasons set forth above, the final order of the Circuit Court of Upshur County is reversed, and this case is remanded to the Family Court of Upshur County for entry of an order consistent with this opinion.

Reversed and Remanded with Directions.

Justice DAVIS and Justice McHUGH dissent and reserve the right to file dissenting opinions.

DAVIS, Justice, dissenting:

In this case, the majority of the Court has concluded that the orders of both the family court and the circuit court should be reversed and that the majority's contrary interpretation of the evidentiary record and governing law settles the parties' dispute as to the meaning of their prenuptial agreement. Because the majority has substituted its own judgment for that of the lower courts when neither the facts nor the law support such a result, I respectfully dissent.

### A. The Record on Appeal Does Not Support the Petitioner's Arguments

The issue before the Court in this case concerns the meaning to be afforded to the phrase "another relationship" as that term is used in the parties' prenuptial agreement. Because the agreement, itself, does not define that term, the majority considered the parties' intent in its construction thereof, adopting Mrs. Lee's interpretation of this phrase as the "correct" meaning of "another relationship." Resolution of the case in this manner is problematic, however, because the record designated by Mrs. Lee, as the party petitioning this Court for relief, does not contain factual support for the relief she has requested.

When a party appeals to this Court for relief from a lower court's order, the petitioner must file a record of the proceedings had in the lower court in order to perfect his/her appeal to permit this Court a meaningful opportunity to review the alleged errors. *See* W. Va. Rev. R.App. P. 5(g)(2). The record on appeal "consists of the papers and exhibits filed in the proceedings in the lower tribunal, the official transcript or recording of proceedings, if any, and the docket entries of the lower tribunal." W. Va. Rev. R.App. P. 6(a). *See also* W. Va. Rev. R.App. P. 7 (detailing requirements for appendix record); W. Va. Rev. R.App. P. 8 (permitting designated record in lieu of appendix record). Moreover, *"the petitioner* is responsible for making the initial determination as to whether a written transcript of a proceeding in the lower tribunal will assist the Court in deciding the issues presented on appeal." W. Va. Rev. R.App. P. 9(a) (emphasis added). Finally, to facilitate the Court's review of errors assigned on appeal, the petitioner's brief is required to include in its argument "appropriate and specific citations to *the record on appeal* . . . ." W. Va. Rev. R.App. P. 10(c)(7) (emphasis added). If the petitioner fails to provide such evidentiary support for his/her arguments, "[t]he Court may disregard errors that are not adequately supported by specific references to the record on appeal." *Id.* Thus, it is clear that a party petitioning this Court for relief from a lower court's order has a duty to provide this Court with a record of the lower court's proceedings. However, the mere provision of a record is not the end of the petitioner's duty. The petitioner also must ensure that the appellate record contains documentation of the lower

court's alleged errors insofar as he/she also is required to reference those specific portions of the record that demonstrate the lower court's alleged errors and support his/her request for relief therefrom.

This Court, also, has recognized an appealing party's responsibility to ensure that the record on appeal supports his/her request for relief.

> An appellant must carry the burden of showing error in the judgment of which he complains. This Court will not reverse the judgment of a trial court *unless error affirmatively appears from the record. Error will not be presumed,* all presumptions being in favor of the correctness of the judgment.

Syl. pt. 5, *Morgan v. Price,* 151 W.Va. 158, 150 S.E.2d 897 (1966) (emphasis added). *Accord* Syl. pt. 4, *Alexander v. Jennings,* 150 W.Va. 629, 149 S.E.2d 213 (1966) (" 'An Appellate Court will not reverse the judgment of an inferior court unless error affirmatively appear upon the face of the record, and such error will not be presumed, all the presumptions being in favor of the correctness of the judgment.' Point 2, syllabus, *Shrewsbury v. Miller,* 10 W.Va. 115 [ (1877) ]."); Syl. pt. 3, *Rollins v. Daraban,* 145 W.Va. 178, 113 S.E.2d 369 (1960) (" 'An Appellate Court will not reverse the judgment or decree of an inferior court, unless error affirmatively appear on the face of the record; and such error will not be presumed, all presumptions being in favor of the judgment or decree.' *Richardson v. Donehoo,* 16 W.Va. 685 [ (1880) ], Pt. 14 Syllabus."); Syl. pt. 4, *Rollins,* 145 W.Va. 178, 113 S.E.2d 369 (" 'A plaintiff in error assumes upon himself the burden of showing error in the judgment complained of.' *Griffith v. Corrothers,* 42 W.Va. 59, [24 S.E. 569 (1896),] Pt. 2· Syllabus."). *See also* Syl. pt. 5, *Pozzie v. Prather,* 151 W.Va. 880, 157 S.E.2d 625 (1967) ("When the alleged errors of the trial court involve the sufficiency of the proof and the testimony upon which the judgment of the trial court is based is not made a part of the record for appellate purposes, the appellate court must presume that the judgment of the trial court is correct and warranted by the testimony."). Thus, an appellant seeking relief from this

Court is required to provide the Court with that portion of the record of the underlying proceedings that supports his/her entitlement to such relief.

Despite Mrs. Lee's clear duty to provide this Court with an evidentiary record from which it could consider fully her request for relief from the orders entered by the family court and the circuit court, Mrs. Lee shirked her obligation by relying, instead, upon a record that does not permit the Court to undertake a full review of her assignments of error. Mrs. Lee contends that her intent as to the meaning of the phrase "another relationship" should prevail over that proposed by Mr. Lee. The record before the Court in this case contains the hearing testimony of Mr. Lee, which fully sets forth and explains his belief as to the meaning of this term. Strikingly absent from the appellate record, however, is any similar statement from Mrs. Lee, either oral or written. This Court's review of the correctness of a lower court's order is substantially assisted by the review of such testimonial statements and hearing transcripts given that they provide insight as to the court's reasoning underlying its ruling. Because the sparse appellate record in this case does not contain information demonstrative of Mrs. Lee's intent in negotiating the terms of the prenuptial agreement she entered into with Mr. Lee prior to their marriage, there is no factual basis to support the reversal of the lower courts' orders. In short, "error [does not] affirmatively appear[ ] from the record" in this case. Syl. pt. 5, in part, *Morgan v. Price,* 151 W.Va. 158, 150 S.E.2d 897.

When error is not readily apparent from the record on appeal, the lower court's order should be affirmed:

> From this record, we cannot say that there was any reversible error in the judgment of the circuit court.... [T]he burden is on the appellant to produce a record which discloses affirmatively the reversible error committed [below].... Ordinarily, the failure to do so requires the affirmance ... of the lower court, since error will not be presumed in the absence of an affirmative showing....

*Delong v. Kermit Lumber & Pressure Treating Co.*, 175 W.Va. 243, 246, 332 S.E.2d 256, 259 (1985) (internal citations omitted). In the case *sub judice*, the limited record, viewed in its entirety, does not compel the conclusion that error is apparent so as to warrant reversal of the lower courts' rulings; consequently, the lower courts' orders should be affirmed. Because the majority nevertheless has presumed the presence of error despite the record's insufficiency and has, correspondingly, reversed the ruling of the circuit court, I dissent.

### B. The Lower Courts' Rulings Were Not Clearly Erroneous

Furthermore, the majority of the Court has failed to afford the circuit court's order the appropriate level of deference that is warranted by the procedural posture of the instant proceeding. The pivotal issue in this case is the meaning of the phrase "another relationship" in the parties' prenuptial agreement. There is no disagreement as to the ambiguity of this term; rather, the dispute concerns the phrase's precise meaning. As observed by the majority in its opinion in this case, such an inquiry is reviewed for clear error:

> This Court has advised that "[w]hen a trial court determines that an agreement is ambiguous and construes the meaning of a provision in the contract based on extrinsic evidence, such as the parties' intent, our standard of review is 'clearly erroneous.'" *Jessee v. Aycoth*, 202 W.Va. 215, 218, 503 S.E.2d 528, 531 (1998) [ (per curiam) (internal citation omitted) ].

Majority Op., 228 W. Va. at 486, 721 S.E.2d at 56. "Clearly erroneous" is not, however, the standard by which the majority ultimately adjudicated the correctness of the circuit court's ruling. Rather, by undertaking a detailed plenary review and interpretation of the contract language at issue herein, the majority essentially conducted a *de novo* review that afforded no deference to the correctness of the lower courts' decisions.

It goes without saying that the subject prenuptial agreement is ambiguous, and the majority appropriately states that such an initial determination of contractual ambiguity is a question of law that we review *de novo*. *See Williams v. Precision Coil, Inc.*, 194 W.Va. 52, 62 n. 18, 459 S.E.2d 329, 339 n. 18 (1995) ("In interpreting a contract, a court determines the existence of an ambiguity as a matter of law." (internal quotations and citations omitted)); *Williams*, 194 W.Va. at 65 n. 23, 459 S.E.2d at 342 n. 23 ("A contract is ambiguous when it is reasonably susceptible to more than one meaning in light of the surrounding circumstances and after applying the established rules of construction. Whether a contract is ambiguous is a legal question reviewable by this Court *de novo*." (internal citation omitted)); Syl. pt. 1, in part, *Berkeley Cnty. Pub. Serv. Dist. v. Vitro Corp. of America*, 152 W.Va. 252, 162 S.E.2d 189 (1968) ("The question as to whether a contract is ambiguous is a question of law to be determined by the court.").

However, once contractual ambiguity has been determined to exist, the next step of the decisional process requires resolution of the ambiguity. Here, the lower courts both determined that they needed to consider extrinsic factual evidence of the parties' intent to define the meaning of the term "another relationship." Such reference to, consideration of, and reliance upon extrinsic evidence to provide meaning to the words used by the parties to a contract constitute the resolution of a question of fact, which this Court reviews for clear error:

> [W]hen a trial court's answers [as to the meaning of contractual provisions] rest not on plain meaning but on differential findings by a trier of fact, derived from extrinsic evidence as to the parties' intent with regard to an uncertain contractual provision, appellate review proceeds under the "clearly erroneous" standard. The same standard pertains whenever a trial court decides factual matters that are essential to ascertaining the parties' rights in a particular situation (though not dependent on the meaning of the contractual terms *per se*). In these types of cases, the issues are ordinarily fact-dominated rather than law-dominated and, to that extent, the trial court's resolution of them is entitled to deference.

*Fraternal Order of Police, Lodge No. 69 v. City of Fairmont,* 196 W.Va. 97, 100, 468 S.E.2d 712, 715 (1996) (footnote omitted). *Accord Jessee v. Aycoth,* 202 W.Va. 215, 218, 503 S.E.2d 528, 531 (1998) (per curiam) ("When a trial court determines that an agreement is ambiguous and construes the meaning of a provision in the contract based on extrinsic evidence, such as the parties' intent, our standard of review is 'clearly erroneous.' " (internal citation omitted)). *See also* Syl. pt. 4, *Moore v. Johnson Serv. Co.,* 158 W.Va. 808, 219 S.E.2d 315 (1975) ("An appellate court's review of fact-finding determinations made by a trial court in the construction of a contract should respect and sustain such interpretations, unless they are clearly erroneous."). Thus, the proper inquiry, as summarized by Justice Cleckley, is "whether the contractual provision at issue is unambiguous. If it is, th[e] case presents a question of law that is subject to our *de novo* review. On the other hand, if ambiguous it becomes a *factual issue, and we must give deference to the findings made below.*" *Fraternal Order of Police,* 196 W.Va. at 101, 468 S.E.2d at 716 (emphasis added).

In conducting a clear error analysis of a lower court's factual determinations of parties' intent in entering a contract, this Court has recognized that

> clear-error review ordinarily heralds a rocky road for an appellant. Under this standard, appellate courts cannot presume to decide factual issues anew. Our precedent ordains that deference be paid to the trier's assessment of the evidence.... In the last analysis, an appellate tribunal should not upset findings of fact or conclusions drawn therefrom unless, on the whole of the record, the judges form a strong, unyielding belief that a mistake has been made. Under this standard, as long as the lower court's rendition of the record is plausible, our inquiry is at an end.

*Id.,* 196 W.Va. at 100 n. 4, 468 S.E.2d at 715 n. 4 (internal citations omitted). In other words,

> [a] finding is clearly erroneous when, although there is evidence to support the finding, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been commit-

ted. However, a reviewing court may not overturn a finding simply because it would have decided the case differently, and it must affirm a finding if the circuit court's account of the evidence is plausible in light of the record viewed in its entirety.

Syl. pt. 1, in part, *In re Tiffany Marie S.,* 196 W.Va. 223, 470 S.E.2d 177 (1996). Accordingly, "absent a mistake of law, an appellate tribunal [has limited authority to] disturb a circuit court's determination [under the] clearly erroneous [standard]. This means, of course, that if there are two or more plausible interpretations of the evidence, the circuit court's choice among them must hold sway." *Tiffany Marie S.,* 196 W.Va. at 237, 470 S.E.2d at 191. Therefore, review of a case for clear error does not give an appellate court unfettered discretion or judicial license to reverse a lower court's decision simply because the appellate court interprets the facts informing the lower court's decision differently than the meaning ascribed thereto by the inferior tribunal. Rather, error must affirmatively appear from the record in the case; error that is so plain as to alert the reviewing court that a mistake clearly has been committed by the lower court, which error is apparent from the lower court's ruling upon the evidence. Syl. pt. 1, in part, *Tiffany Marie S.,* 196 W.Va. 223, 470 S.E.2d 177.

There is no question that, under the facts of the case *sub judice,* there were "two ... plausible interpretations of the evidence." *Tiffany Marie S.,* 196 W.Va. at 237, 470 S.E.2d at 191. As such, the circuit court's determination, based upon its review of the facts, was entitled to deference. The majority of the Court was not at liberty to substitute its own interpretation of the evidence for that of the circuit court, particularly where the record presented for appellate consideration in this case failed to support the petitioner's request for relief much less evidence a definite mistake in the circuit court's ruling emanating therefrom. In short, the inadequate appellate record simply does not beget a "definite and firm conviction that a mistake has been committed" by the circuit court. Syl. pt. 1, in part, *Tiffany Marie S.,* 196 W.Va. 223, 470 S.E.2d 177.

Equally troubling is the specific type of contract that is at issue in the case *sub*

*judice.* The majority, through its decision, effectively has nullified the parties' prenuptial agreement, into which both parties freely entered, despite the fact that this Court long has acknowledged its obligation to uphold prenuptial agreements: "[T]he legal system must continue to encourage marriage even if that means honoring prenuptial agreements that are not to judges' personal liking." *Gant v. Gant,* 174 W.Va. 740, 746, 329 S.E.2d 106, 113 (1985), *overruled on other grounds by Ware v. Ware,* 224 W.Va. 599, 687 S.E.2d 382 (2009). *See also Gant,* 174 W.Va. at 749, 329 S.E.2d at 116 ("Unless a prenuptial agreement is so outrageous as to come within unconscionability principles as developed in commercial contract law, ... West Virginia courts will not evaluate the substantive fairness of prenuptial agreements[.]" (internal citation omitted)). While the decision obtained by the circuit court upon the evidence before it may not have been the most preferable way of resolving the instant controversy, such resolution was not so fraught with error as to be manifestly wrong. Accordingly, this Court was required to defer to the circuit court's judgment. Instead, the majority refused to afford the circuit court the deference it was due. I cannot condone such an unwarranted result.

For the foregoing reasons, I respectfully dissent from the majority's opinion in this case. I am authorized to state that Justice McHugh joins me in this dissenting opinion.