# STATE OF WEST VIRGINIA
## SUPREME COURT OF APPEALS

**Mary Anne C. Teed,**
**Petitioner Below, Petitioner**

**FILED**

May 17, 2013
RORY L. PERRY II, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

**vs)  No. 12-0421** (Kanawha County 09-D-2372)

**James L. Teed,**
**Respondent Below, Respondent**

## MEMORANDUM DECISION

Petitioner-Wife Mary Anne C. Teed, by counsel Lyne Ranson, appeals the February 24, 2012, order of the Circuit Court of Kanawha County that denied her appeal of the November 9, 2011, final order of the Family Court of Kanawha County in her action for divorce. Respondent-Husband, James L. Teed, by counsel Mark A. Swartz, filed a response in support of the circuit court's order. Mrs. Teed filed a reply.

This Court has considered the parties' briefs and the record on appeal. The facts and legal arguments are adequately presented, and the decisional process would not be significantly aided by oral argument. Upon consideration of the standard of review, the briefs, and the record presented, the Court finds no substantial question of law and no prejudicial error. For these reasons, a memorandum decision is appropriate under Rule 21 of the Rules of Appellate Procedure.

The parties began a long-distance relationship in 1991. Mrs. Teed lived in Arlington, Virginia; Mr. Teed lived in Charleston, West Virginia, where he owned an accounting firm. In November of 1995, the parties became engaged when Mrs. Teed discovered she was pregnant. Mrs. Teed quit her consulting job in January of 1996, in part because of her pending marriage and anticipated move to Charleston, and in part because of job-related issues. However, Mrs. Teed remained in Arlington until the parties' marriage in March of 1996.

Early in 1996, Mr. Teed, whose assets were significantly greater than Mrs. Teed's, asked Mrs. Teed to sign an antenuptial agreement ("agreement") drafted by his lawyer. Mr. Teed urged Mrs. Teed to hire a lawyer to represent her in regard to the agreement. Mrs. Teed complied. Mrs. Teed claims that at her sole meeting with her lawyer, she explained the situation and gave him a copy of the agreement and contact information for Mr. Teed's lawyer. She also claims that she did not discuss the contents of the agreement with her lawyer and he did not explain its ramifications to her. Thereafter, Mrs. Teed's lawyer discussed possible revisions to the agreement with Mr. Teed's lawyer. At least one of the revisions proposed by Mrs. Teed's lawyer was incorporated into the "revised" agreement; that revision required Mr. Teed to fund an annuity for Mrs. Teed during the parties' marriage.

1

Thereafter, the parties set and then cancelled various wedding dates. Mr. Teed claims the wedding dates were cancelled due to conflicts in the parties' schedules. Mrs. Teed claims that the dates were canceled because she had not yet signed the agreement.

Mr. Teed visited Mrs. Teed in Arlington on March 24, 1996, four days before the parties' next scheduled wedding date. Mrs. Teed, who was then seven months pregnant, states that she first saw the revised agreement that day. However, Mr. Teed believes Mrs. Teed got a copy of the revised agreement a day or two earlier. The parties reviewed the revised agreement along with a notebook containing Mr. Teed's financial and business documents for approximately twenty minutes. Mrs. Teed claims Mr. Teed left the revised agreement with her, but took the notebook that contained his financial information when he left to return to Charleston. Mrs. Teed avers that she called her lawyer repeatedly over the next few days, but he never returned her calls.

When Mr. Teed arrived in Arlington the night before the parties' March 28, 1996, wedding, Mrs. Teed claims that Mr. Teed told her again that he would not marry her if she did not sign the agreement. Just prior to the wedding, Mrs. Teed signed the agreement without additional legal advice and without having read the agreement in its entirety. Mrs. Teed maintains that she signed the agreement because she did not want her child to be born out of wedlock.

The parties' antenuptial agreement states, in relevant part, as follows:

> Each party hereby releases the other from all duty or obligation of support and agrees to look solely to that party's separate property and income for support.

> Each party hereby waives any right to claim, assert, receive or collect permanent alimony, temporary alimony, rehabilitative alimony, or any support or alimony against or from the other party.

> [In the] event the parties . . . divorce, [Mr. Teed] agrees to pay rehabilitative alimony to [Mrs. Teed] in the amount of $6,000.00 per month during the first year following the entry of the divorce decree and $3,000.00 per month during the second year . . . adjusted for the effects of inflation. . . .

> Each of the parties forever waives . . . any right or claim . . . to equitable distribution [of their "Separate Estates."]

> "Separate Estates" [are defined as] any and all property . . . that the other may own or have an interest in at the time of such marriage, may acquire with separate funds after the marriage, and all increases and appreciation of such property which may result regardless of whether the increase is the result of labor performed . . . by the other party . . . which contributes to the appreciation or increase in value of the separate property.

2

[Mr. Teed and Mrs. Teed] will merge sufficient amounts of their current income to provide a fund for their common marital needs . . . [t]he merger of such income shall be evidenced by funds that are held jointly in any account, note or other evidence of estate or title. . . .

Mr. Teed agrees, during the term of the marriage, to contribute $500.00 per month into a variable commercial annuity [for the benefit of Mrs. Teed]. . . .

During the parties' marriage, Mr. Teed formed a second accounting firm and purchased other businesses and rental property. Mrs. Teed states that at Mr. Teed's request, she did not work outside the home during the marriage, and that she performed essentially all of the homemaking and childcare duties. Mrs. Teed filed for divorce on October 29, 2009, on adultery and other grounds.

At a January 19, 2010, temporary support hearing, Mrs. Teed challenged the validity of the parties' agreement. The family court set a hearing on the matter for May 19, 2010. Following this hearing, the family court entered its July 28, 2010, "Order Regarding Antenuptial Agreement," that found the parties' agreement to be valid and enforceable.

On January 26, 2011, the family court entered an order regarding Mrs. Teed's motion to characterize businesses started or acquired by Mr. Teed during the marriage as marital property. Based on the language in the agreement, the family court denied Mrs. Teed's motion and found that Mr. Teed's businesses were part of his separate estate and, therefore, not subject to equitable distribution.

The family court entered its final order divorcing the parties on November 9, 2011, which Mrs. Teed appealed to the circuit court.

Mrs. Teed now appeals the circuit court's February 24, 2011, order denying her appeal of the family court's final order. In appeals of such orders, we apply the following the standard of review:

In reviewing a final order entered by a circuit court judge upon a review of, or upon a refusal to review, a final order of a family court judge, we review the findings of fact made by the family court judge under the clearly erroneous standard, and the application of law to the facts under an abuse of discretion standard. We review questions of law *de novo*.

Syl., *Carr v. Hancock*, 216 W.Va. 474, 607 S.E.2d 803 (2004).

On appeal, Mrs. Teed raises five assignments of error. Mrs. Teed's first assignment of error is that the family court abused its discretion in finding that the parties' agreement was valid and enforceable. Mrs. Teed argues that the agreement was invalid and unenforceable because it was not fair or reasonable, and was obtained by fraud, duress, and by Mr. Teed's unconscionable conduct. In support of her argument, Mrs. Teed relies upon *Mitchell v. Mitchell*, 205 W.Va. 203, 208, 517 S.E.2d 300, 305 (1999), wherein the Court stated that pursuant to West Virginia Code §

3

48-2-16(a) (1984), a final divorce order must conform to the separation agreement if the agreement is fair and reasonable, and not obtained by fraud, duress, or other unconscionable conduct by one of the parties.

Mrs. Teed argues that she was under duress when she signed the agreement because she was seven months into a high-risk pregnancy and had no job or health insurance. Mrs. Teed also argues that the agreement was unconscionable because the parties' bargaining positions were unequal, Mrs. Teed had insufficient access to Mr. Teed's financial information, and the agreement gave Mrs. Teed almost nothing of value acquired during the marriage while Mr. Teed got his full marital share of Mrs. Teed's valuable homemaker and childrearing services. Alternatively, Mrs. Teed argues that if the agreement is not unconscionable, it is still invalid and unenforceable because the parties' circumstances changed so significantly, from the time the parties' married in 1996, to the time they divorced in 2011, that enforcement of the agreement would be inequitable pursuant to Syllabus 3 of *Gant v. Gant*, 174 W.Va. 740, 329 S.E.2d 106 (1985),[1] which provides as follows:

> [a]t the time a prenuptial agreement is presented to a court for enforcement a court may consider whether the agreement's terms are ostensibly fair. Unless, however, the agreement is unconscionable, as that term has been defined in the general law of contracts, a court's review of the agreement's ostensible "fairness" is limited to an inquiry into whether circumstances have changed to such an extent from what the parties foresaw at the time they entered into the agreement that enforcement would be inequitable.

Mrs. Teed claims that when she signed the agreement in 1996, she could not have foreseen the present poor state of the economy, the doubling of unemployment rates, or the vastly more difficult job market.

Mrs. Teed also argues that the agreement is invalid and unenforceable because her legal representation was inadequate. Mrs. Teed contends that because she did not have sufficient contact with her lawyer, she did not understand the agreement's contents and legal effects, or that Mr. Teed's lawyer did not also represent her interests.

Mrs. Teed last argues that Mr. Teed should be precluded from enforcing the agreement because he failed to perform his only obligation under the agreement—his duty to create an annuity for Mrs. Teed's benefit and to make monthly deposits into it. Mrs. Teed contends that because Mr. Teed never complied with this term, his consideration for the agreement was illusory and insufficient.

In its "Order Regarding Antenuptial Agreement" entered July 28, 2011, the family court considered and rejected each of Mrs. Teed's arguments, in turn. For example, in regard to Mrs. Teed's duress argument, the family court found that in 1991, the Legislature amended West Virginia Code 48-2-1(b) (1984) to eliminate pregnancy as a statutory ground to void an antenuptial agreement, in part, because antenuptial agreements encourage marriage.

---

[1] *Gant* was overruled on other grounds in *Ware v. Ware,* 224 W.Va. 599, 687 S.E.2d 382 (2009).

4

In support of its rejection of Mrs. Teed's unconscionability and unforeseen events arguments, the family court found that there was

> nothing unreasonable about [Mrs. Teed's] waiver of any interests in separate estates. . . . Both parties were middle-aged, both had been married before, both were represented by independent counsel, [Mrs. Teed] was pregnant at the time of the signing of the agreement and no other children were born of the parties; and that the divorce occurred sufficiently close in time (fourteen years) to the signing of the antenuptial agreement that this divorce was an event that was contemplated and foreseen at the time [the] agreement was entered into.

In support of its findings, the family court cited to *Gant,* 174 W.Va. at 749, 329 S.E.2d at 116, which provides as follows:

> West Virginia courts will not evaluate the substantive fairness of prenuptial agreements; most prenuptial agreements are designed to preserve the property interests of the stronger party. Nonetheless, prenuptial agreements will be enforced in their explicit terms only to the extent that circumstances at the time the marriage ends are roughly what the parties foresaw at the time they entered into the prenuptial agreement. In this regard the passage of time, a change of position based upon reasonable reliance on the permanence of the marriage, and the birth of children are relevant factors, among others, for a court to consider.

In rejecting Mrs. Teed's inadequate legal representation argument, the family court cited to Syllabus Point 5 of *Ware* which states, in relevant part, "[f]or the presumption of validity to apply to a prenuptial agreement, both parties to that agreement must be represented by independent counsel." The family court then found that Mrs. Teed was highly educated, had ample opportunity to read and review the agreement before the parties' wedding, and was represented by independent counsel who worked with Mr. Teed's lawyer to modify the agreement for Mrs. Teed's benefit. The family court noted that Mrs. Teed could have delayed the parties' wedding, which had already been twice delayed, to allow Mrs. Teed further time to consult with her lawyer.

In regard to Mrs. Teed's argument that Mr. Teed should be precluded from enforcing the agreement because he failed to create Mrs. Teed's annuity, the family court noted in its final order that the agreement anticipated that Mr. Teed might fail to create the annuity, and specifically provided that, in that event, Mrs. Teed had the right to recover any missed payments.

In light of the family court's well-reasoned and comprehensive findings and conclusions regarding the validity and enforceability of the parties' antenuptial agreement, we cannot say that the family court erred.

Mrs. Teed's second assignment of error is that the family court abused its discretion in finding that Mrs. Teed was entitled to only the two years of rehabilitative alimony provided by the agreement. Mrs. Teed argues that pursuant to West Virginia Code § 48-6-201(b),

5

[a]ny award of periodic payments of spousal support shall be deemed to be judicially decreed and subject to subsequent modification unless there is some explicit, well expressed, clear, plain and unambiguous provision to the contrary set forth in the court-approved separation agreement or the order granting the divorce. . . .

Mrs. Teed contends that because the agreement contains no provision prohibiting modification of her rehabilitative alimony, the family court, pursuant to West Virginia Code § 48-6-201(b), should have modified Mrs. Teed's alimony. Mrs. Teed adds that pursuant to West Virginia Code § 48-8-104, Mr. Teed's fault—his admission of adultery—must be taken into consideration in any modification of alimony.

In regard to Mrs. Teed's argument that spousal support payments are modifiable absent an explicit provision in a "court-approved separation agreement or the order granting the divorce," we note that, contrary to Mrs. Teed's claims, the family court's final order contains an explicit provision that requires Mr. Teed to pay Mrs. Teed alimony "pursuant to the parties' [a]ntenuptial [a]greement." Therefore, West Virginia Code § 48-6-201(b) is not applicable in the instant case. Further, as we noted above, the family court did not abuse its discretion in finding the agreement to be valid and enforceable. Therefore, the agreement's terms regarding alimony are valid and enforceable, and may not be modified absent an agreement of the parties.

Mrs. Teed's third assignment of error is that the family court abused its discretion in finding that Mrs. Teed had no equitable share in the businesses Mr. Teed purchased or acquired during the marriage. Similarly, Mrs. Teed's fourth assignment of error is that the family court abused its discretion when it found that Mr. Teed's alleged co-mingling of marital earnings with separate property did not transmute the character of the separate property into marital property. Mrs. Teed argues that West Virginia Code § 48-2-1(e)(1) (1986) expresses a marked preference for characterizing the property of the parties to a divorce action as marital property.

In its January 26, 2011, order regarding Mrs. Teed's motion to characterize businesses started or acquired by Mr. Teed during the marriage as marital property, the family court rejected Mrs. Teed's arguments and ordered that, in accordance with the parties' agreement, only those assets that were jointly held or titled would be divided by equitable distribution. As such, because Mr. Teed's businesses were not jointly held, they were not subject to equitable distribution under the following language in the agreement:

Each of the parties forever waives . . . any right or claim . . . to equitable distribution [of their "Separate Estates."]

"Separate Estates" [are defined as] any and all property…that the other may own or have an interest in at the time of such marriage, may acquire with separate funds after the marriage, and all increases and appreciation of such property which may result regardless of whether the increase is the result of labor performed…by the other party…which contributes to the appreciation or increase in value of the separate property.

6

> [Mr. Teed and Mrs. Teed] will merge sufficient amounts of their current income to provide a fund for their common marital needs...*[t]he merger of such income shall be evidenced by funds that are held jointly in any account, note or other evidence of estate or title. . . .*

(Emphasis added.) Given this language, it is clear that the family court appropriately applied the relevant provisions of the parties' valid and enforceable agreement in denying Mrs. Teed's request for equitable distribution of Mr. Teed's separate estate. Therefore, we cannot say that the family court abused its discretion.

Mrs. Teed's fifth and final assignment of error is that the family court abused its discretion in adopting Mr. Teed's expert's "blended method" of valuing Mrs. Teed's annuity that Mr. Teed failed to fund. Mrs. Teed argues that the blended method unfairly yielded the lowest possible valuation for the annuity. Mrs. Teed claims that the family court should have used her expert's .37% "proxy return" method to value the annuity.

The family court found that the blended method provided the most realistic estimation of the value of Mrs. Teed's annuity, had it been funded during the course of the marriage. The family court based that ruling on the fact that Mr. Teed's method applied the *actual* change in blended appraisal with S&P, NYSE, and Government bonds, whereas the 37% proxy return method applied only an *average* change.

In her brief on appeal, Mrs. Teed fails to state how the family court's findings were clearly erroneous or how the family court abused its discretion in applying the law to the facts. Thus, we presume that the family court's proceedings and judgment were correct.

> On an appeal to this Court the appellant bears the burden of showing that there was error in the proceedings below resulting in the judgment of which he complains, all presumptions being in favor of the correctness of the proceedings and judgment in and of the trial court.

Syl. Pt. 2, *Perdue v. Coiner*, 156 W.Va. 467, 194 S.E.2d 652 (1973).

> For the foregoing reasons, we affirm the circuit court's order.

Affirmed.

**ISSUED:** May 17, 2013

**CONCURRED IN BY:**

Justice Robin Jean Davis
Justice Margaret L. Workman
Justice Menis E. Ketchum
Justice Allen H. Loughry II

**NOT PARTICIPATING:**

Chief Justice Brent D. Benjamin

8