IN RE the MARRIAGE OF: Philip H. WARREN,
Petitioner-Appellant,

v.

May Holtz WARREN, Respondent.

Court of Appeals

*No. 88–1109. Submitted on briefs October 10, 1988.—Decided
November 23, 1988.*

(Also reported in 433 N.W.2d 295.)

On behalf of the petitioner-appellant, the cause was submitted on the briefs of *Debra A. Slater* of *Weiss, Berzowski, Brady & Donahue* of Milwaukee.

On behalf of the respondent, the cause was submitted on the brief of *Robert W. Weber* of *Schwartz, Weber, Tofte & Nielsen* of Racine.

Before Scott, C.J., Brown, P.J., and Nettesheim, J.

BROWN, P.J.   In this divorce case, the issue is whether the premarital agreement was correctly determined to be inequitable because the circumstances of the parties at the time of divorce were

beyond the contemplation of the parties when making the agreement. Specifically, the trial court here found that the wife's early retirement from teaching was not part of a meeting of the minds when the parties executed their contract. We observe that the determinative question is whether the wife's retirement was reasonably foreseeable at the time the agreement was drawn. Since the uncontroverted evidence is that both parties knew that early retirement could well result if the parties married, we reverse.

The parties to the divorce action are Philip Warren and May Holtz Warren, who were 73 years old and 59 years old respectively at the time of the divorce. The parties, both widowed, became acquainted with each other as a result of an ad seeking companionship placed by Philip in a newspaper. May answered the ad and noted that while she was still working, she "would like to retire soon."

The parties met, courted, and decided to marry. Before the marriage, they each indicated a desire to enter into a premarital agreement to protect their individually-acquired assets and to provide certainty for their financial futures. They met with Philip's attorney on November 19, 1985 and spent two to three hours discussing an agreement. This discussion resulted in a proposed agreement for each party to retain his or her assets and all earnings from those assets. (Philip's assets were worth about $900,000 and May's totaled approximately $300,000.) They would equally share living expenses, and maintenance was waived.

In early or mid-December, the parties continued to have discussions between themselves. One of the subjects was whether May should take early retirement from her job as a schoolteacher. This discussion

was especially pertinent because May had a house in Racine where her job was located. Philip had a house and business interests to look after in Burlington, about thirty miles away. May expressed a phobia about driving on icy highways to her job during the winter months should she move to Burlington. She also questioned the expense of a sixty-mile daily round trip. However, if May was to take advantage of her early retirement, she would have to make the request prior to January 7. Another consideration in whether to take early retirement was that the parties had hopes of traveling, a circumstance which would be hampered if May were working full time. For his part, Philip decided to leave the decision up to May.

None of the discussions regarding early retirement apparently necessitated changes or additions to the proposed agreement, and after Philip's counsel drafted the agreement, May's lawyer reviewed it with her. The parties signed the agreement on December 30. Thereafter, May took early retirement; the two were married on February 15, 1986.

Less than a year later, Philip filed for divorce. In response, May asked the court to disregard the premarital agreement and award maintenance and property division. She asserted that, subsequent to the agreement, she was induced to retire from her job as a schoolteacher and that this caused a condition not contemplated by the parties when making the agreement. The trial court eventually agreed and ordered that Philip pay May $30,000, which was the calculated amount of the pension benefits May lost by taking early retirement. Philip appeals.

We begin with the landmark case in Wisconsin concerning prenuptial agreements—*Button v. Button,* 131 Wis. 2d 84, 388 N.W.2d 546 (1986). Our supreme

court explained the following regarding changed circumstances after the execution of a premarital agreement:

> Clearly an agreement fair at execution is not unfair at divorce just because the application of the agreement at divorce results in a property division which is not equal between the parties or which a court might not order under sec. 767.255. If, however, there are significantly changed circumstances after the execution of an agreement and the agreement as applied at divorce no longer comports *with the reasonable expectations of the parties,* an agreement which is fair at execution may be unfair to the parties at divorce.

*Id.* at 98–99, 388 N.W.2d at 552 (emphasis added).

Thus, the supreme court recognized that a spouse will not be saved from an unwise agreement unless the circumstances of the parties at divorce were beyond the contemplation of the parties at the time the agreement was made. *Id.; accord McHugh v. McHugh,* 436 A.2d 8, 11 (Conn. 1980).

Our supreme court also elaborated on the concept of uncontemplated change of circumstances. The court defined this in terms of reasonable foreseeability. The court wrote:

> In framing the agreement the parties should consider the circumstances existing at the execution of the agreement *and those reasonably foreseeable.*

*Button,* 131 Wis. 2d at 97, 388 N.W.2d at 551 (emphasis added).

██

Thus, for a change of circumstances to be uncontemplated, the event must not have been reasonably

foreseen by the parties prior to or at the time of the making of the agreement.

The standard of unforeseeable changed circumstances appears to be the emerging test in other states as well as Wisconsin. *See, e.g., Gant v. Gant,* 329 S.E.2d 106, 114–15 (W. Va. 1985). It used to be that the standard was confined only to the amorphous concept of "fairness." However, fairness, without further elaboration, gives no guidance concerning which agreements should be binding and which should be struck down. *Id.* at 114. Measuring an agreement by an undefined judicial standard of fairness is an invitation to the very wealth redistribution that these agreements are designed to prevent. *Id.* Prenuptial agreements are, in the final analysis, an outgrowth of a couple's desire to opt out of the marital property system. This is a favored result because it encourages marriage where parties might otherwise be reluctant for fear of loss of property should the marriage fail. Our courts should enforce the specific terms of the agreement if the circumstances at the time the marriage ends were what the parties foresaw at the time they entered into the prenuptial agreement. *Id.* at 116.

The trial court did not focus on the term "reasonable foreseeability." In fact, the trial court did not refer to the term at all in its decision. Rather, the trial court limited its analysis to whether the early retirement was "a factor that was covered under the agreement." The trial court found that May was only "thinking" about early retirement at the time the prenuptial agreement was signed. The trial court concluded that the retirement was therefore not a contracted-for consequence of the agreement.

The trial court seemed to be under the impression that the agreement must memorialize, either explicitly or implicitly, a meeting of the minds of the couple about what events will take place following the signing of the agreement. It apparently held that if any events following the agreement are such as not to have been agreed upon by the parties, then they are changed circumstances which are not subject to the prenuptial agreement. The trial court ostensibly believed that if the parties did not tacitly agree to a certain future event, then it would not be "fair" to uphold the agreement in its entirety.

■

The trial court undertook the wrong analysis. Whether the parties covered future circumstances in their prenuptial agreement is not the test. The proper test is for the trial court to determine whether, before the signing of the agreement, the parties were able to reasonably predict a particular event. The test is not whether they agreed that this event would either occur or not occur.

Thus, for example, if the health of one of the parties substantially deteriorates after the marriage, that could be an unforeseen circumstance not contemplated by the parties when the agreement was made; or if a middle-aged couple with grown children suddenly faces an unplanned pregnancy, that too might qualify as an unforeseen circumstance dependent on the facts in the case. The idea behind the test is that both spouses have a right to rely upon the prenuptial agreement when all subsequent events transpire as logically anticipated.

■

The premarital agreement is, after all, a contract with all of its attendant risks and risk bearing. Risk

may be defined as uncertainty in regard to cost, loss, or damage. A. Kronman & R. Posner, *The Economics of Contract Law* 26 (1979). A person signing a premarital agreement undertakes all the normal anticipated risks that the agreement may not prove to be a wise one. Only when a future event can be said to have been too uncertain can it be said that the risk assumed is out of proportion to the loss incurred.

In this case, May and Philip foresaw the eventuality that she would take early retirement before the agreement was signed. May discussed the idea with Philip and verbalized her fear of the winter driving and its costs. They both knew that keeping the job would hamper their travel plans. The fact that May eventually took early retirement was predictable at the time of the agreement. Thus, the circumstances at the time of the divorce were not beyond the parties' contemplation at the time of the agreement. We hold that the early retirement was reasonably foreseeable at the time the agreement was entered into.

May claims that the agreement, even if not ruled inequitable, is but one of the twelve factors that a trial court is to consider when dividing property at the divorce. May claims that trial courts are not bound by premarital agreements. The argument is of no merit. Section 767.255, Stats., provides in part:

> The court shall presume that all other property is to be divided equally between the parties, but may alter this distribution ... after considering:
>
> ....
>
> (11) Any written agreement made by the parties before or during the marriage concerning any arrangement for property distribution; *such agreements shall be binding upon the court except*

*that no such agreement shall be binding where the terms of the agreement are inequitable as to either party.* The court shall presume any such agreement to be equitable as to both parties. [Emphasis added.]

The statute teaches that if the agreement is found equitable, then the agreement controls.

■

May cites a footnote from *Torgerson v. Torgerson,* 128 Wis. 2d 465, 383 N.W.2d 506 (Ct. App. 1986), to support her proposition.

Even property covered by a marital agreement is not, per se, exempt property. Rather, the agreement is but a factor which the court should consider in making its property division. *See* sec. 767.255(11), Stats.

*Id.* at 469 n. 2, 383 N.W.2d at 508. This statement was dicta; it was not concerned with the issues. Moreover, it is not a correct statement of the law as it conflicts with the statute. We therefore withdraw the language we wrote in that footnote. Thus, the law is that the trial court must first make a determination about whether the agreement is inequitable. If the contract is found to be equitable, then the agreement controls regardless of other factors.

*By the Court.*—Judgment reversed.