**COURT OF APPEALS
DECISION
DATED AND FILED**

**June 16, 2020**

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

**Appeal No.    2019AP844**

**STATE OF WISCONSIN**

Cir. Ct. No.  2015FA455

**IN COURT OF APPEALS
DISTRICT III**

IN RE THE MARRIAGE OF:

TERA L. JUNION,

    PETITIONER-RESPONDENT,

  V.

DONALD J. JUNION,

    RESPONDENT-APPELLANT.

       APPEAL from a judgment of the circuit court for Marathon County: MICHAEL K. MORAN, Judge.  *Affirmed*.

       Before Stark, P.J., Hruz and Seidl, JJ.

¶1    SEIDL, J. Donald (Don) Junion appeals a divorce judgment that terminated his marriage to Tera Junion.[1]   Don contends the circuit court erroneously exercised its discretion by concluding the parties' marital property agreement (MPA) was unenforceable.   For the reasons set forth below, we conclude there is no basis to disturb the court's discretionary decision.   We therefore affirm.

## BACKGROUND

¶2    The parties were married in May 1999.  Neither party had previously been married.  They have one child, a son born in April 2000.

¶3    Several weeks before their marriage, the parties entered into an MPA.  The MPA provided, in most pertinent part, that "all property or interests in real or personal property now held by or hereafter acquired by each party, of whatever nature or description, whether real or personal and wherever situated, shall be owned and classified as that party's individual property," subject to certain additional provisions.  One of these additional provisions stated that for every year of the parties' marriage, $6400 worth of Don's individual property would convert to marital property, "and such sum shall be divided equally between the parties" in the event of the dissolution of the marriage.

¶4    The MPA also addressed spousal maintenance.  Specifically, it provided that if the marriage lasted less than eight years, no maintenance would be awarded to either party.  If the marriage lasted longer than eight years, however, then maintenance could be awarded.

---

[1]  Because the parties share a surname, we refer to them individually by their first names.

¶5      Tera petitioned for divorce in June 2015.  The primary dispute between the parties during the divorce proceedings concerned the enforceability of the MPA.  To resolve that issue, the circuit court held a contested divorce hearing on April 18, 2017.

¶6      Tera testified at the hearing that she met and began dating Don in 1994, when she was twenty-three years old.  At that time, she had a high school diploma and had completed some college coursework, although she was not actively pursuing an advanced degree.  Instead, she was working full-time at a dance studio—employment she kept while the parties were dating and throughout the course of their marriage.

¶7      Don testified that he was eleven years older than Tera.  After graduating high school, he immediately began working in the construction industry.  He did so until 1993, the year before he met Tera, at which time he began a career as a financial advisor in his father's office at American Express.

¶8      The parties dated continuously from 1994 until 1997, when they separated for approximately eight months.  Both parties acknowledged the reason for this separation was that Don wanted Tera to sign an MPA before they married, and Tera did not wish to do so.  Upon their reconciliation, the parties attended a series of counseling sessions, at which they discussed Don's desire to have an MPA.  After the counseling sessions, Tera agreed to sign an MPA and the parties became engaged to be married.

¶9      The parties' testimony regarding the circumstances surrounding the negotiation and eventual signing of the MPA differed significantly.  Tera stated she retained an attorney to help her review a draft of the MPA, which had been prepared by Don's counsel.  The attorney she contacted had previously helped her

mother with the sale of a family business, and Tera was unaware whether he had any experience with family law.

¶10 Tera further testified that she met with her attorney only once, for approximately half an hour, to review the MPA before signing it. She had never read any marital property agreement before that meeting, and she could not recall whether she read the entire proposed MPA before she signed it. Tera also stated that her attorney never explained what Wisconsin law provided for, in terms of maintenance or property division, when a long-term marriage dissolved and the parties did not have a marital property agreement.

¶11 Regarding the insertion of certain provisions into the MPA, Tera believed that her attorney proposed allowing for maintenance payments if the marriage lasted longer than eight years. She could not recall, however, who proposed the provision stating that $6400 worth of Don's individual property would convert into marital property for every year of marriage—although she did not think it was something she would have supplied on her own.

¶12 Tera stated that, to her knowledge, the purpose of the MPA was "to protect anything [Don] had going into the marriage. Whatever he had prior was his, anything from the marriage going forward would be ours and joint, and this [MPA] was to protect anything of his prior to the marriage." In all, Tera summarized her comprehension of the MPA by stating: "It was a lot of language. A lot of it I did not understand."

¶13 Don testified that after his attorney drafted the MPA, but before Tera hired her own attorney, he reviewed the MPA with Tera page by page. The two then "had discussions" about the MPA's contents and "agreed on it." After Tera subsequently hired her own attorney, however, she proposed modifications to the

MPA—which modifications were ultimately accepted by Don and incorporated into the final MPA.

¶14    Namely, according to Don, Tera informed him that she desired a provision in the MPA to allow for a certain amount of his individual property to be converted to marital property for every year that they were married.  In response, Don proposed the provision converting $6400 to marital property, to which Tera agreed.  Don also stated that Tera's attorney proposed the allowance for maintenance payments to be awarded upon divorce if the marriage lasted longer than eight years.

¶15    Don testified that after the parties had agreed on a tentative final draft of the MPA, he accompanied Tera to her attorney's office so that they could review the final draft with him.  Tera stated she could not recall this meeting, but that if it did occur, it would have been intimidating for her to discuss with her attorney the legal effect of certain terms in the MPA while in the presence of Don. Don acknowledged that they did not sign the MPA at this meeting, but he stated that at the meeting's conclusion Tera's attorney signed a certification that Tera was entering into the MPA knowingly and willingly.[2]

¶16    On April 26, 1999, the parties signed the MPA, and also initialed each page, in the presence of Don's attorney (and Don's attorney's spouse).  Don testified that before the parties did so his attorney read aloud every word on every page of the MPA and asked both parties if they understood and if they had any questions.  According to Don, Tera had no questions.  Tera did not testify whether

---

[2] This certification, dated April 23, 1999, is attached to the MPA that appears in the appellate record.

5

she recalled asking any questions at this meeting, but she indicated that it would have been difficult for her to discuss the terms and effect of the MPA given that her attorney was not present, while Don and his attorney were present.

¶17    A provision within the MPA stated that each party had "fairly and reasonably disclosed to the other all their respective incomes, assets, expenses, and liabilities." The parties also attached financial disclosures to the MPA. Don's disclosure listed $464,000 in assets and $38,000 in liabilities, for a net worth of $426,000, and Tera's disclosure listed $37,000 in assets with no liabilities. Neither party's financial disclosure listed their current income or expenses.

¶18    Don testified that he disclosed his income to Tera prior to their signing of the MPA by providing her with his Social Security earnings records from 1975 through 1998. Those records showed that, prior to 1998, Don had never earned more than $50,000 in any year. In 1998, however, his annual income increased to $87,172.[3] Tera, on the other hand, testified that prior to signing the MPA Don's business and income "really was never discussed."

¶19    Don testified that shortly after the parties' marriage, he learned that a possible change in the relationship between his father's office and American Express was being discussed. That change involved a formal franchise agreement, with the local office no longer receiving health benefits paid by American Express and also having to pay franchise fees and other expenses. The franchise

---

[3] Whether Tera disclosed her premarital income to Don before the MPA was signed was not at issue at the contested divorce hearing. We observe that a copy of Tera's Social Security earnings records, introduced into evidence during the divorce proceedings, shows that Tera's annual income from 1993 through 1998 averaged just over $15,000, with a peak of $20,278 in 1998.

agreement was reduced to writing in October 1999, five months after the parties' marriage, and was finalized in March 2000.

¶20 Don's father retired in the spring of 2000, shortly before the franchise agreement was finalized. Don explained that his father "wanted to have the medical [benefits] so he walked out," leaving his entire client base to Don. Don's income subsequently increased to $231,358 in 2000, and his annual income remained above $100,000 until he retired in 2012.

¶21 Tera testified that after the parties' son was born in 2000, she took care of him during the day while Don worked. Then, at night, Don took care of him while Tera worked at the dance studio. The parties never hired a day care provider, and so this arrangement continued until approximately 2010. At that time Tera began working an additional job, in an office administrator position, during the day.

¶22 Tera continued to work both a day job (with various employers) and at the dance studio for the remainder of the marriage. Her highest annual income during the marriage was $32,208 in 2013, and her annual income averaged $20,666.35 over the course of the entire marriage.

¶23 The parties shared the responsibility for paying their various household expenses during their marriage. Although they maintained a joint checking account for approximately two-and-one-half years at the beginning of the marriage, they terminated that account because, according to Don, Tera "wasn't handling it responsibly." Thereafter, they maintained separate bank accounts.

¶24 In 2012, Don retired at the age of fifty-three. He testified he based his decision to do so on a number of factors, including his: (1) shrinking client

base; (2) declining physical health[4]; and (3) knowledge that two individuals in his industry were willing to (and ultimately did) purchase his business for $250,000. Additionally, Tera assured Don that she would continue working until he was sixty-five years old in order to provide him with health insurance.

¶25    At the time of the parties' divorce, Tera's individual assets totaled $206,518.[5]   Don's individual assets were worth over ten times that amount, totaling $2,176,767.  Neither party reported any significant liabilities.

¶26    Following the April 18, 2017 contested divorce hearing, the circuit court concluded the MPA was unenforceable.  The court reasoned that the MPA failed to satisfy any of the three requirements necessary to enforce an MPA, as set forth by our supreme court in *Button v. Button*, 131 Wis. 2d 84, 99, 388 N.W.2d 546 (1986).

¶27    After holding an additional hearing to address issues not relevant to this appeal, the circuit court entered a judgment awarding two-thirds of the marital estate to Don and one-third of the estate to Tera.  The court declined to award maintenance to either party, but it held that issue open for both parties for a period of eight years.  Don now appeals, challenging only the court's refusal to enforce the MPA.

---

[4] After he retired, Don was diagnosed with a number of medical conditions, including sleep apnea, heart disease, and atrial fibrillation.  Although his diagnoses came post-retirement, he testified that he was experiencing the symptoms associated with these conditions before his retirement.

[5] Tera's largest single asset, a $125,575 retirement account, was created by Don in Tera's name in 1998 without her knowledge; she learned of its existence during the divorce proceedings.  It is undisputed that Don's contributions to this account were neither contemplated nor required by the MPA.

**STANDARD OF REVIEW**

¶28    We review a circuit court's determination that a marital property agreement is unenforceable for an erroneous exercise of discretion. *See Button*, 131 Wis. 2d at 99. Under that standard, we will affirm the circuit court as long as it examined the relevant facts, applied the correct standard of law and, using a demonstrated rational process, reached a conclusion that a reasonable judge could reach. *Randall v. Randall*, 2000 WI App 98, ¶7, 235 Wis. 2d 1, 612 N.W.2d 737. When reviewing the court's decision, we are obligated to accept its determinations regarding witness credibility. *Gardner v. Gardner*, 190 Wis. 2d 216, 230, 527 N.W.2d 701 (Ct. App. 1994). Moreover, because the notion of discretion is "fundamental to the trial court's ability to fulfill its role in the legal system, 'we will search the record for reasons to sustain its exercise of discretion.'" *Roy v. St. Lukes Med. Ctr.*, 2007 WI App 218, ¶11, 305 Wis. 2d 658, 741 N.W.2d 256 (citation omitted).

**DISCUSSION**

¶29    WISCONSIN STAT. § 767.61(3) (2017-18)[6] provides that when dividing parties' property upon divorce, a circuit court starts with the presumption that it is to equally divide all of the property subject to division. This presumption may be overcome, however, after consideration of a number of factors, including as set forth in § 767.61(3)(L):

> Any written agreement made by the parties before or during the marriage concerning any arrangement for property distribution; such agreements shall be binding

---

[6] All references to the Wisconsin Statutes are to the 2017-18 version unless otherwise noted.

> upon the court except that no such agreement shall be binding where the terms of the agreement are inequitable as to either party. The court shall presume any such agreement to be equitable as to both parties.

¶30 Our supreme court has determined that a marital property agreement will be considered "equitable," and therefore enforceable, when all three of the following requirements are met: (1) each spouse has made a fair and reasonable disclosure of his or her financial status to the other spouse; (2) each spouse has entered into the agreement voluntarily and freely; and (3) the substantive provisions of the agreement that apply to the property division upon divorce are fair to each spouse. *Button*, 131 Wis. 2d at 89. The first two requirements are assessed as of the time of the agreement's execution; the third requirement is assessed at the time of execution but also, if circumstances change significantly during the marriage, at the time of the divorce. *See id.*

¶31 Here, the circuit court found that the MPA failed to meet all three of the *Button* requirements for enforceability. While a failure on any one of the three elements is sufficient to support the court's decision, we address, and reject, each of Don's challenges to the court's decision in turn.

*A. The first Button requirement*

¶32 Again, the first *Button* requirement addresses whether each spouse made a fair and reasonable disclosure to the other spouse of his or her "financial status" prior to the signing of a marital property agreement. *Id.* at 95. The circuit court found that the MPA failed to meet this requirement because Don did not disclose to Tera the possibility that his father would soon retire and transfer his client base to Don, nor did Don disclose the details of the possible American Express franchise agreement. The court explained:

This Court does not find credible that there was a full disclosure in everything that [Don] was aware of, of the finances and potential for foreseeable financial opportunities [Don] had. This Court finds that regarding— in looking at credibility, that there were foreseeable opportunities and their effects were not sufficiently discussed by the parties, not necessarily that they were withheld in any way but that there was not a full discussion of the financial—foreseeable financial opportunities or discussion of foreseeable financial situation. There was an opportunity, this Court finds, for financial gain before the signing of the agreement. There may not have been a formal understanding of what it would be and I find it incredible to believe the information regarding this possibility that there would potentially be a large increase in income and assets was not foreseeable at the time the agreement was put together and it may have been a driving factor, though I don't know because there is so much dispute about what happened during that time, that was the basis for pushing so hard for this prenuptial agreement to be signed because of that foreseeable future.

¶33    Don argues the circuit court's finding in this regard constituted an erroneous exercise of discretion because the court "applied the wrong legal standard."[7]  He reasons that future projections of income are "speculation," and the fair and reasonable disclosure requirement looks only to whether "facts"

---

[7] In his brief-in-chief, Don asserted the circuit court "erred when it found" that Don had knowledge of his impending business opportunities when he signed the MPA. In his reply brief, however, Don apparently concedes that the court's finding in this regard—which, as set forth, the court reached by "looking at credibility"—was not clearly erroneous by clarifying that he is "not challenging any credibility finding by the court. [He] is challenging the standard set by the court."

In any event, the evidence presented at the hearing—namely, the short amount of time between the signing of the MPA and the reduction of the franchise agreement to writing— permitted a reasonable inference that Don was aware he would soon have the opportunity for significant financial gain. We will not second-guess a circuit court's reasonable factual inferences when the court acts as a finder of fact. *Dickman v. Vollmer*, 2007 WI App 141, ¶14, 303 Wis. 2d 241, 736 N.W.2d 202. Consequently, we limit our discussion to whether the court applied the correct legal standard in reaching its decision that the first *Button* requirement was not met. *See Button v. Button*, 131 Wis. 2d 84, 388 N.W.2d 546 (1986).

known to the parties were disclosed. *See Button*, 131 Wis. 2d at 95. Stated differently, Don contends the "law does not require [a party] to develop financial projections and speculate about different scenarios and what might occur in the future."

¶34     We conclude the circuit court did not apply the wrong legal standard in reaching its decision regarding the first *Button* requirement. As the *Button* court explained when it adopted the "fair and reasonable" disclosure requirement, the "public interest requires that a financial agreement between spouses or prospective spouses be executed under conditions of candor and fairness." *Id.* at 95. Here, the circuit court's explanation of its decision plainly demonstrates it found that candor and fairness were not present due to "foreseeable opportunities and their effects [not being] sufficiently discussed by the parties." Thus, on this record, we discern no basis to disturb the court's exercise of its discretion in determining that the first *Button* requirement was not met.

¶35     Relatedly, we agree with Tera that Don is incorrect in arguing that the "law requires only that spouses make a fair and reasonable disclosure to the other of his or her assets, liabilities, and debts." To be sure, the *Button* court did comment that the failure to disclose those specific items would result in an inequitable marital property agreement. *See id.* But nowhere did the *Button* court purport to limit the disclosure requirement to only a party's assets, liabilities and debts. Indeed, the court ultimately adopted the broad term "financial status" in defining what one party must fairly and reasonably disclose to the other. *Id.* at 99.

¶36     Moreover, the *Button* court also stated that "[i]n framing the agreement the parties should consider the circumstances existing at the execution of the agreement and those *reasonably foreseeable*." *Id.* at 97 (emphasis added).

Although Don correctly notes that the court made this statement when discussing its third requirement (i.e., substantive fairness), *see id.*, he fails to explain why reasonable foreseeability would appropriately be considered under one factor but not another. Nor would such a result be logically consistent. It necessarily follows that if parties are expected to frame their agreements considering circumstances that are reasonably foreseeable under the third requirement, they would have to be candid about those circumstances to satisfy the first requirement.

¶37 Don also argues that "[i]t is unclear exactly what more [he] could have shared with Tera to satisfy the [circuit] court." We disagree, as the court stated exactly what it believed Don should have shared with Tera—his "foreseeable financial opportunities." In all, on this record and for the reasons stated, we cannot conclude that the court erroneously exercised its discretion in determining the MPA was inequitable under the first ***Button*** requirement.

### B. The second ***Button*** requirement

¶38 As noted, the second Button requirement addresses whether the agreement was entered into voluntarily and freely. ***Button***, 131 Wis. 2d at 95. Factors for a court to consider when analyzing this requirement include "whether each party was represented by independent counsel, whether each party had adequate time to review the agreement, whether the parties understood the terms of the agreement and their effect, and whether the parties understood their financial rights in the absence of an agreement." ***Id.*** at 95-96.

¶39 The circuit court found that Tera did not enter into the MPA freely and voluntarily because she did not have a "complete understanding" of the MPA's terms. The court found Tera "credible" when she testified "that she did not completely understand this agreement." The court continued, "I don't think

she fully understands it and I have to judge the credibility based upon my view of the testimony, and that's how the Court feels."

¶40    Don essentially contests the circuit court's factual finding that Tera did not have a complete understanding of the MPA on two grounds. First, he notes that it is undisputed that Tera had independent counsel. Thus, he faults the court for finding that Tera did not enter into the MPA voluntarily and freely because, according to him, the "equitableness inquiry for purposes of enforcing an MPA asks whether a party has *independent* counsel, not *effective* counsel." Second, although he "does not challenge" the court's finding that Tera did not understand the MPA, he contests the "reasonableness of Tera's misunderstanding of the MPA."

¶41    Don's arguments concerning the effectiveness of Tera's attorney provide no basis for reversal. In essence, Don asks us to adopt a rule holding that if a party has independent counsel, a circuit court lacks the discretion to give weight to the other relevant considerations concerning whether that party freely and voluntarily entered into a marital property agreement. Such a rigid rule would ignore the purpose of the inquiry under the second **Button** requirement—to determine if a party's decision to enter into an MPA was the product of a "meaningful choice." *See **id.*** at 95.

¶42    Indeed, the record here shows why Don's proposed rule would be misguided. As Tera notes, she provided undisputed testimony that her attorney never explained to her what her rights upon dissolution of the marriage would be if she married Don without an MPA. The circuit court was entitled to, and implicitly did, accept that testimony. *See **Gardner***, 190 Wis. 2d at 230. There would be no purpose in a party retaining independent counsel if that counsel failed to provide

advice allowing a client to make a meaningful choice before signing an MPA. The court therefore did not err in considering how the performance of Tera's counsel impacted her ability to make a meaningful choice to enter into the MPA when the court assessed whether the second *Button* factor was met.

¶43 Turning to Don's second argument, Don misses the mark by arguing that Tera's misunderstanding of the MPA was unreasonable. As Tera aptly notes, "[t]he question is not whether a reasonable person would have understood the MPA; it is whether *Tera* understood the MPA."[8] *See Button*, 131 Wis. 2d at 95-96 (stating the relevant inquiry is whether "*the parties* understood the terms of the agreement and their effect") (emphasis added). The circuit court was therefore well within its discretion to determine that Tera's lack of understanding deprived her of the ability to make a meaningful choice when she entered into the MPA.

### C. The third *Button* requirement

¶44 The final *Button* requirement addresses the substantive fairness of a marital property agreement. *See id.* at 89. Substantive fairness is an "amorphous concept" that must be determined on a case-by-case basis, in light of two competing principles: "the protection of the parties' freedom to contract and the protection of the parties' financial interests at divorce." *Id.* at 96. For an agreement to be equitable, it must be substantively fair both at the time of its execution and, if circumstances significantly change after execution of the agreement, at the time of divorce. *Gardner*, 190 Wis. 2d at 234.

---

[8] We emphasize that Don "does not challenge" the circuit court's finding that Tera credibly testified she did not understand the terms of the MPA.

¶45     Where, as here, the MPA is alleged to be substantively unfair at the time of divorce, the question is whether the parties were able to reasonably predict events such that the circumstances at the time of divorce are within a range of circumstances anticipated by the parties at the time they entered into the marital property agreement.  *See* **Warren v. Warren**, 147 Wis. 2d 704, 709-10, 433 N.W.2d 295 (Ct. App. 1988).  The circuit court answered this question in the negative.  It explained:  "The changes in circumstances in this case were not anticipated given [Don's] early retirement, the birth of their son and resources and sacrifices made during the marriage by each of the parties."

¶46     Don contends these changes do not justify the circuit court's finding that the MPA was substantively unfair because the first change only adversely affected Don and the other changes were reasonably foreseeable at the time the parties entered into the MPA.  Specifically concerning the birth of the parties' son, Don argues the court erred in placing any weight on the fact that the MPA was silent as to childcare issues because it was entirely predictable that a child could be born of the marriage.  Thus, according to him, the parties could have addressed that issue in the MPA, and their failure to do so does not justify refusing to enforce the entire document.

¶47     Don is correct that we have stated that when analyzing a marital property agreement's substantive fairness, "[w]hether the parties covered future circumstances in their prenuptial agreement is not the test.  The proper test is for the trial court to determine whether, before the signing of the agreement, the parties were able to reasonably predict a particular event."  *See **id.*** at 710.  The **Warren** court went on to clarify, however, that the "idea behind the test is that both spouses have a right to rely upon the prenuptial agreement when all subsequent events transpire as logically anticipated."  ***Id.***

16

¶48 This principle—that parties have a right to rely on events transpiring as logically anticipated—is critical in this case. As explained above, the circuit court found that Don failed to communicate to Tera his reasonably foreseeable financial opportunities before she signed the MPA. As a result, the parties were in much different financial positions than Tera could have reasonably anticipated when the events identified by the court, and not addressed in the MPA, occurred during the marriage.

¶49 To explain, in the years prior to their marriage, Tera and Don both had relatively low earnings—Don's annual income exceeded $50,000 only once, while Tera's annual income never exceeded $21,000. After the marriage, Tera's annual income remained comparable to her premarital level, averaging $20,666.35. Don's average income, on the other hand, experienced a sharp increase almost immediately after the marriage, and it never dipped below $100,000 until his retirement in 2012.

¶50 Thus, when the parties' child was born, Tera had to expend significant time caring for their son each day (without accruing any financial benefit), and then go to work in the evenings, just to maintain an income level comparable to what she had prior to the marriage. Don, on the other hand, was able to continue working similar hours and earn a substantially higher income than what he had prior to the marriage. Stated differently, Tera's ability to remain self-supporting and independent during the marriage was much more detrimentally

impacted by the time and new expenses associated with raising their child than was Don's ability to do the same.[9]

¶51 This disparate impact was reflected by the parties' respective assets at divorce: Tera had accumulated just $15,410 in retirement funds attributable to her own income, and her non-retirement savings were only $1660.[10] Don, in contrast, had accumulated over $2,000,000 in assets. Given the conditions under which the parties entered into the MPA, we cannot conclude that the circuit court erroneously exercised its discretion by deciding that this result was substantively unfair.

*By the Court.*—Judgment affirmed.

Not recommended for publication in the official reports.

---

[9] Tera testified that she paid for the groceries for the entire family, clothing for her son, certain medical bills for her son, and other various expenses.

[10] Don notes that the value of Tera's assets appreciated at a rate comparable to Don's during the marriage. As stated, however, the bulk of Tera's assets came from Don's own contributions to her retirement fund, which contributions were neither required nor contemplated by the terms of the MPA. Don presents no developed argument explaining why an action that is neither required nor contemplated by an agreement can be used to show that the agreement itself is substantively fair. We therefore decline to further address this undeveloped argument. *See State v. Pettit*, 171 Wis. 2d 627, 646, 492 N.W.2d 633 (Ct. App. 1992).