COURT OF APPEALS
DECISION
DATED AND FILED

March 18, 2021

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No.    **2019AP1968**

Cir. Ct. No.  **2018FA5**

STATE OF WISCONSIN

**IN COURT OF APPEALS
DISTRICT IV**

IN RE THE MARRIAGE OF:

PATRICIA WISCHER P/K/A PATRICIA DYBDAL,

   PETITIONER-RESPONDENT,

  V.

ANTHONY B. DYBDAL,

   RESPONDENT-APPELLANT.

APPEAL from a judgment of the circuit court for Waupaca County: TROY NIELSEN, Judge. *Affirmed*.

Before Kloppenburg, Graham, and Nashold, JJ.

**Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1    PER CURIAM.  Anthony Dybdal appeals a judgment of divorce, arguing that the circuit court erred in determining that the parties' Prenuptial Marital Property Agreement was inequitable and in not strictly applying its terms. We affirm.

## BACKGROUND

¶2    Patricia Wischer and Anthony Dybdal were married in 2004.  The marriage was Dybdal's first and Wischer's second, and the parties did not have any children together.   Nine days before the marriage, the parties signed a Prenuptial Marital Property Agreement (Agreement), drafted by Wischer's attorney.  Dybdal was not represented by an attorney in the drafting or execution of the Agreement.  The purpose of the Agreement was to protect approximately $11 million in lawsuit settlement proceeds that Wischer received as a result of the death of her first husband, who died in 1999 during the construction of Miller Park's retractable roof.  The settlement proceeds were held in a revocable trust in Wischer's name.  At the time the parties signed the Agreement, Wischer also owned a home in Waukesha, a property in northern Wisconsin, vehicles, and various other items of personal property.  Dybdal brought few assets to the marriage.

¶3    The Agreement provided that all property that was then titled or that during the marriage became titled in the sole name of a party or that party's trust was classified as that party's individual property.  The Agreement further provided that all property that was then titled or that during the marriage became titled in the names of both parties was classified as marital property. In the event of divorce, the Agreement provided in pertinent part as follows:

(a) It is the express intention of both parties that this Agreement shall be binding on the issue of property division and support or maintenance. The parties acknowledge that this Agreement constitutes a written agreement which is binding upon the divorce court pursuant to Wis. Stats. §767.255(3)(L). The parties further acknowledge that this Agreement is equitable as to both parties.

(b) All property of the parties shall be divided as of the date the petition for the resulting dissolution of the marriage was filed, as follows:

(i) Each party shall be allowed to retain the property then classified hereunder as his or her individual property;

(ii) Property then classified hereunder as marital property or survivorship marital property shall be divided, equally, between the parties….

¶4 During the marriage, the parties acquired four separate parcels of real estate in Wisconsin, each of which was titled in both of their names and would therefore constitute marital property to be divided equally upon divorce pursuant to the Agreement. The total value of the real estate amounted to approximately $1.4 million: $784,000 for an apartment complex in Fond du Lac that was purchased as an investment property, $425,000 for a residence in Fremont, $80,000 for a vacation property in Beaver, and $187,100 for a vacation property in Pound. At the time of trial, the Fond du Lac property was encumbered by a line of credit on which approximately $274,000 was owed and the Fremont property was encumbered by a debt of approximately $6,800. The Beaver and Pound vacation properties were debt-free. The parties also acquired over twenty vehicles, including recreational vehicles, and took on at least two dozen credit card or loan obligations.

¶5 Wischer petitioned for divorce on January 4, 2018, and a two-day trial was held in April 2019. At the time of the trial, Wischer's trust account contained just under $1 million of the $11 million in settlement proceeds. Following the hearing, the circuit court determined that it would be inequitable to Wischer to enforce the Agreement. Therefore, the court deviated from the terms of the Agreement, awarding Wischer more than a 50% share of the marital property while granting Dybdal a lesser share of the marital property, although Dybdal's share was less encumbered by debt than Wischer's share. With regard to the real estate, which is the primary subject of dispute on appeal, the court awarded the two vacation homes in Pound and Beaver to Dybdal. The residence in Fremont was awarded to Wischer, as was the Fond du Lac investment property. The court rejected Dybdal's request that Wischer be required to provide an equalizing payment to Dybdal.

¶6 Dybdal appeals.

## DISCUSSION

¶7 Dybdal argues that the circuit court erred in determining that the Agreement was inequitable to Wischer and in declining to strictly apply its terms. As we explain, we conclude that the circuit court did not erroneously exercise its discretion.

## *I. Applicable Legal Standards*

¶8      WISCONSIN STAT. § 767.61(3) (2019-20)[1] provides that when dividing parties' property upon divorce, a circuit court starts with the presumption that it is to equally divide all property subject to division.   However, this presumption may be overcome after consideration of a number of factors, including a written agreement between the parties, as described in § 767.61(3)(L):

> Any written agreement made by the parties before or during the marriage concerning any arrangement for property distribution; such agreements shall be binding upon the court except that no such agreement shall be binding where the terms of the agreement are inequitable as to either party.   The court shall presume any such agreement to be equitable as to both parties.

Our supreme court has determined that a marital property agreement will be considered "equitable," and therefore enforceable under § 767.61(3)(L), when all three of the following requirements are met: (1) each spouse has made a fair and reasonable disclosure of his or her financial status to the other spouse; (2) each spouse has entered into the agreement voluntarily and freely; and (3) the substantive provisions of the agreement dividing the property upon divorce are fair to each spouse.  *See **Button v. Button***, 131 Wis. 2d 84, 89, 388 N.W.2d 546 (1986).  The first two requirements are assessed as of the time of the agreement's execution; the third requirement is assessed at the time of execution but also, if circumstances change significantly during the marriage, at the time of the divorce.  *See **id.***

---

[1] All references to the Wisconsin Statutes are to the 2019-20 version unless otherwise noted.

¶9      The parties do not dispute that the first two ***Button*** requirements were met in this case.   Their disagreement focuses on the third requirement: whether the property division provided in the Agreement was fair to each spouse at the time of divorce.  This third requirement addresses the substantive fairness of a marital property agreement.   *See **id.*** at 96.   Substantive fairness is an "amorphous concept" that must be determined on a case-by-case basis, in light of two competing principles: "the protection of the parties' freedom to contract and the protection of the parties' financial interests at divorce."   ***Id.*** at 96.   "[T]he legislature requires a divorce court to scrutinize an agreement between the spouses carefully."   ***Id.*** at 94.   "The parties are free to contract, but they contract in the shadow of the court's obligation to review the agreement on divorce to protect the spouses' financial interests on divorce."   ***Id.***   The burden of production of evidence and the burden of persuasion rest on the party challenging the agreement as inequitable at the time of divorce.  *See **id.*** at 93-94.

¶10     An agreement is unfair at the time of divorce if "there are significantly changed circumstances after the execution of an agreement and the agreement as applied at divorce no longer comports with the reasonable expectations of the parties."   ***Id.*** at 98-99.   The question is whether the parties, before signing the agreement, "were able to reasonably predict a particular event," also expressed as whether an event is "reasonably foreseeable."   *See **Warren v. Warren***, 147 Wis. 2d 704, 710-711, 433 N.W.2d 295 (Ct. App. 1988); ***Button***, 131 Wis. 2d at 97.

¶11     A circuit court's determination as to whether an agreement is inequitable is discretionary and our review is limited.  *See **Button***, 131 Wis. 2d at

99.[2]  "The statutory test of equitability … leaves enforceability generally to the [circuit] court's sense of fairness.  Discretion is inherent in the test." ***Hengel v. Hengel***, 122 Wis. 2d 737, 744, 365 N.W.2d 16 (Ct. App. 1985).  A discretionary determination "must be the product of a rational mental process by which the facts of record and law relied upon are stated and are considered together for the purpose of achieving a reasoned and reasonable determination." ***Hartung v. Hartung***, 102 Wis. 2d 58, 66, 306 N.W.2d 16 (1981).  Further, "[i]t is recognized that a [circuit] court in an exercise of its discretion may reasonably reach a conclusion which another judge or another court may not reach, but it must be a decision which a reasonable judge or court could arrive at by the consideration of the relevant law, the facts, and a process of logical reasoning." ***Id.***

## II.  The Circuit Court's Discretionary Determination *that the Agreement was Inequitable*

¶12    In reaching its discretionary determination that the Agreement was inequitable, the circuit court analyzed pertinent case law discussing WIS. STAT. § 767.61(3),[3] including the landmark case of ***Button***, discussed above.  Although the court did not explicitly use ***Button***'s phrase, "significantly changed

---

[2] Dybdal ignores well-established precedent stating that a circuit court's determination as to whether a marital property agreement is equitable is reviewed for an erroneous exercise of discretion.  Instead, Dybdal focuses on whether Wischer has met her burden of proof to overcome the presumption under Wis. Stat. § 767.61(3)(L) that the Agreement was equitable and argues that whether a party has met its burden is an issue of law. *See* ***Brandt v. Brandt***, 145 Wis. 2d 394, 409, 427 N.W.2d 126 (Ct. App. 1988) ("Whether a party has met the burden of proof is a question of law which we examine without deference to the trial court's conclusions.").  Regardless of the burden of proof, the ultimate question we address in this case is whether the circuit court erroneously exercised its discretion in determining that the Agreement was inequitable to Wischer, and we therefore employ that standard of review here.

[3] At the time of the ***Button*** decision, the statute was codified as WIS. STAT. § 767.255(11).

circumstances" in determining that the Agreement was inequitable, the court implicitly determined that such a change of circumstances had occurred between the time the Agreement was executed and the time of divorce. *See State v. Berggren*, 2009 WI App 82, ¶18, 320 Wis. 2d 209, 769 N.W.2d 110 ("[W]hen the record does not include a specific finding on an issue, this court will assume that the issue was resolved by the trial court in a manner which supports the final judgment or order."). The court noted that over the course of the parties' 13-year marriage, they had "successfully set fire to about $8 million." The record supports this conclusion, showing that, of the approximately $11 million in settlement proceeds that Wischer originally had in her trust account, less than $1 million remained at the time of divorce, and the parties had less than $2 million in real and personal property.

¶13     The circuit court's finding that the parties spent $8 million was in conjunction with the court's additional findings regarding the parties' respective financial contributions to the marriage. The court found that Wischer "paid and funded [the] marriage," whereas Dybdal's contribution was "peanuts in comparison," and that "even if money technically came out of the pocket of Mr. Dybdal, it first came from the pocket of Ms. [Wischer]." The court concluded that, under these circumstances, "[t]o strictly apply the prenuptial agreement as requested by [Dybdal] would continue to adversely impact [Wischer's] financial situation because of the collective poor fiscal decisions these two parties made over, and over, and over, and over, and over again." In other words, although the parties collectively made poor financial decisions, enforcement of the Agreement would disproportionately and unfairly impact Wischer, who had funded the marriage. The court further observed that the parties "operated through this marriage very much inconsistent with the general themes" of the Agreement,

which, as stated, was created for the purpose of protecting Wischer's substantial assets. Thus, the court implicitly, and reasonably, determined that such inconsistent conduct constitute an unexpected change in circumstances that was neither reasonably foreseeable by the parties at the time of marriage nor equitable at the time of divorce. *Warren*, 147 Wis. 2d at 708-11.

¶14 Dybdal points out that Wischer was the only person who could withdraw funds from her trust account, and suggests that her intentional draws on that account cannot be considered an unexpected change in circumstances. However, Dybdal cites no authority for the proposition that intentional actions cannot serve as a basis for a finding that a significant change in circumstances has occurred. Nor has Dybdal presented any other persuasive argument or authority that undermines the circuit court's discretionary determination that the parties' spending of approximately $8 million of Wischer's trust funds during the 13-year marriage was beyond the reasonable expectations of the parties at the time of the Agreement and that enforcement of the Agreement would be inequitable to Wischer.

¶15 Moreover, in addition to the circuit court's reliance on the significant sum of money spent by the parties during their marriage, the circuit court also relied on the evidence of record showing that, although Dybdal was employed when the parties were married, he suffered a motorcycle accident in 2007 and, "generally speaking," did not return to the workforce during the balance of the marriage, with some "limited exceptions," including work at the Fond du Lac apartment complex. Dybdal testified that, as a result of the accident, for which Wischer paid hundreds of thousands of dollars in medical bills, Dybdal suffers progressive injuries, including a sciatic nerve problem, destruction of two lower vertebrae, and a missing lung; and that Dybdal intended to file for disability. The

parties could not have reasonably predicted that the motorcycle accident would occur, that Dybdal would generally not return to the workforce, or that Wischer would be exclusively financially responsible for Dybdal.

¶16 Dybdal challenges the circuit court's finding related to his failure to return to the workforce, noting that he managed and maintained the Fond du Lac investment property for several years after the accident, which contributed to the financial success of the property. However, in concluding that Dybdal generally did not return to the workforce, the court expressly referenced "limited exceptions," which included Dybdal's work at the investment property. Moreover, the fact that Dybdal worked at the investment property is not inconsistent with the court's finding that, "generally speaking," Dybdal did not return to the workforce following the motorcycle accident. Nor is Dybdal's work at the investment property inconsistent with the court's conclusion that Wischer "funded" the marriage and that "even if money technically came out of the pocket of Mr. Dybdal, it first came from the pocket of Ms. [Wischer]." The evidence showed that Wischer funded all or nearly all of the original $1.2 million for the investment property, and that Dybdal was paid for his work on the property. Moreover, to the extent that Dybdal seeks to challenge the court's finding regarding his level of participation in the workforce, we note that the court was best positioned to evaluate the testimony and other evidence on this point, and we do not second-guess the court's finding. *See State v. Gomez*, 179 Wis. 2d 400, 404, 507 N.W.2d 378 (Ct. App. 1993) (it is the trier of fact's function to decide issues of credibility, weigh the evidence and resolve conflicts in testimony).

¶17 In sum, Dybdal has not shown, based on the record and applicable law, that the circuit court erroneously exercised its discretion in determining that the Agreement was inequitable as to Wischer and therefore need not be enforced.

### *III. Dybdal's Reliance on* **Gardner** *and* **Steinmann**

¶18    Dybdal argues that the circuit court was required to enforce the unambiguous language of the Agreement pursuant to **Gardner v. Gardner**, 190 Wis. 2d 216, 527 N.W.2d 701 (Ct. App. 1994), and **Steinmann v. Steinmann**, 2008 WI 43, 309 Wis. 2d 29, 749 N.W.2d 145.  Dybdal's reliance on these cases is misplaced.

¶19    In **Gardner**, this court upheld a marital property agreement over objections that the terms of the agreement were inequitable, concluding that the agreement's terms were "plain and straightforward."  **Gardner**, 190 Wis. 2d at 228.  Dybdal states that the language of the parties' Agreement here is likewise plain and straightforward and therefore should have been enforced.    However, simply because language in a marital property agreement is unambiguous does not mean that it is equitable or fair at the time of divorce.

¶20    Dybdal also recites the following language from **Gardner**: "Substantive unfairness at the divorce is not proven by a side-by-side comparison of the property each party received when the marriage was terminated.  'An agreement is not unfair at divorce just because the application of the agreement results in a property division which is not equal between the parties….'"  **Id.** at 234 (quoted source omitted).  It is unclear why Dybdal believes this language assists him, given that the circuit court's determination in this case was not based on these factors.  Because Dybdal does not point to any principle or discussion from **Gardner** that sheds light on the issues here, his reliance on **Gardner** is unavailing.

¶21    **Steinmann** is likewise unhelpful to Dybdal in showing that the circuit court in this case erroneously exercised its discretion.  Significantly,

*Steinmann* does not address whether the marital agreement in that case was inequitable and therefore unenforceable. Instead, the court explicitly notes: "There is no dispute that the Agreement is binding, valid and enforceable. Rather, the dispute between [the parties] pertains to the Agreement's reach and application in this case." *Steinmann*, 309 Wis. 2d 47, ¶23.

¶22 Dybdal appears to rely on *Steinmann* for the proposition that the circuit court in this case was required to equally divide the jointly titled property but instead employed tracing principles to award property based on which party provided the funds for the property. Dybdal relies on the following language from *Steinmann*:

> [W]hen separate property presumed to be indivisible is transmuted through a joint tenancy, it is effectively transferred to marital property, and tracing does not cause the property to revert back to its original separate property identity. In such cases, '[t]he transfer of separately owned property into joint tenancy changes the character of the ownership interest in the entire property into marital property which is subject to division.'

*Id.*, ¶35 (quoted source omitted). *Steinmann* is inapplicable here, not only because, as discussed above, it does not address whether a marital agreement is equitable or enforceable, but also because the circuit court in this case did not employ tracing principles. In fact, the court specifically disavowed such an approach:

> I agree with [Dybdal's counsel's] reliance on *Steinmann*, … in which the Court is prohibited from engaging in or utilizing tracing principles under the circumstances that this very case has. So I'm not going to engage in those tracing-type principles to try to lead back from what is clearly marital property to figure out who provided the assets for that piece of property; in part because *Steinmann* says that can't be done and [also because] that makes a whole of sense to me."

Dybdal fails to show that the circuit court used tracing principles, contrary to *Steinmann*, nor has he shown why *Steinmann* is at all germane to this case, when *Steinmann* does not address the equitableness of a marital property agreement and when, unlike in *Steinmann*, there is no dispute in this case over the classification of the property at issue.

¶23 Because Dybdal has failed to show that the circuit court's determinations in this case were inconsistent with *Gardner* or *Steinmann*, we reject Dybdal's arguments that are based on those cases.

### IV. Consideration of Deceased Spouse's Interests

¶24 Dybdal's remaining argument is that the circuit court erred in considering the impact of the Agreement on Wischer's deceased first husband. At the end of the trial, the circuit court stated: "Quite frankly, the only person I have a whole lot of sympathy or empathy for in this whole proceeding isn't in the room. If one believes in an afterlife, I imagine Mr. Wischer is looking down with a level of frustration unbeknownst to many." We do not agree that this comment can fairly be read to indicate that the court considered the interests of Wischer's deceased first husband when determining that the Agreement was inequitable to Wischer. We therefore reject Dybdal's argument on this point.

### CONCLUSION

¶25 For the foregoing reasons, we affirm.

*By the Court.*—Judgment affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)5.

13